UNITED STATES of America, Plaintiff-Appellee,

v.

Joseph D. BEASLEY, Defendant-Appellant.

No. 77–3415 Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

Oct. 19, 1978.

---

\* Rule 18, 5 Cir.; *see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.,* 5 Cir., 1970, 431 F.2d 409, Part I.

Arthur A. Lemann, III, New Orleans, La., Leonard B. Boudin, New York City, for defendant-appellant.

John P. Volz, U. S. Atty., Albert J. Winters, Jr., Don M. Richard, Asst. U. S. Attys., New Orleans, La., for plaintiff-appellee.

Before RONEY, GEE and FAY, Circuit Judges.

PER CURIAM:

The denial of appellant's second motion for a new trial is affirmed on the basis of Judge Rubin's order of December 21, 1977, appended hereto.

## APPENDIX

Crim. No. 74–149.

United States District Court
E. D. Louisiana.

Dec. 21, 1977.

ALVIN B. RUBIN, Circuit Judge. *

Dr. Joseph Beasley, ("Beasley"), has now filed a second motion for a new trial. He was convicted in 1975 of conspiracy to defraud the United States of its right to have its program under Title IV–A of the Social Security Act administered fairly, honestly and free from corruption, deceit, trickery and dishonesty, in violation of 18 U.S.C. § 371 and § 2, and of filing or causing to be filed false claims in violation of 18 U.S.C. § 287 and § 2. Dr. Beasley was tried twice. The first trial resulted in a hung jury, the second in a conviction.[1] The details of Dr. Beasley's scheme are set forth in the opinion of the court of appeals affirming the denial of the first new trial motion. *U. S. v. Beasley,* 5th Cir. 1977, 550 F.2d 261.

The present motion is predicated upon the recent testimony of Messrs. Don Hubbard ("Hubbard") and Sherman Copelin ("Copelin") in a civil proceeding brought against them by the Family Health Foundation in receivership. It is contended that their testimony is newly discovered evidence within the meaning of Rule 33, F.R. Cr.P., that it evidences a failure of the prosecution to comply with the mandate of *Brady v. Maryland,* 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, and that the prosecutors are guilty of misconduct for inaccurately summarizing Hubbard's testimony in a resume they presented to defense counsel at Dr. Beasley's first trial. For the

---

* Sitting as district judge by special designation of Chief Judge John R. Brown.

1. Both new trial motions followed the second trial.

reasons set forth in this opinion, these contentions are without merit and the defendant's second motion for a new trial is DENIED.

### I.

■ Newly discovered· evidence is evidence that could not have been discovered with due diligence at the time of trial. *Luhrsen v. Vantage S. S. Corp.,* 5th Cir. 1975, 514 F.2d 105; *U. S. v. Slutsky,* 2d Cir. 1975, 514 F.2d 1222. Hence, a number of courts have held that, where a party fails to call a witness who was available during trial, the testimony of that witness cannot be considered newly discovered evidence. *U. S. v. LaVallee,* 2d Cir. 1974, 504 F.2d 580; *U. S. v. Mello,* 1st Cir. 1972, 469 F.2d 356; *U. S. v. Pordum,* 2d Cir. 1971, 451 F.2d 1015; *Baker v. U. S.,* 1970, 139 U.S.App. D.C. 126, 430 F.2d 499; *Rodriquez v. U. S.,* 5th Cir. 1967, 373 F.2d 17. As the Fifth Circuit noted in affirming the denial of the first new trial motion, not only were Messrs. Hubbard and Copelin available to the defense as witnesses, but "the trial judge . . . offered to call [them] as the court's witnesses if either the government or defense desired it, but neither side accepted the court's offer." 550 F.2d, at 267.

■ Everyone was aware, at the time of both the first and second trials, that Copelin and Hubbard had relevant information with respect to the issues raised. There was no doubt as to their identity, whereabouts or availability. Exactly what they would say on the stand was not known. The prosecution had taken some brief testimony before a grand jury on a single aspect of the case, money delivered to Mr. Copelin by one Bob Parsons. But Mr. Copelin was involved in a number of matters touched upon in the evidence. He had never testified about these. Three Assistant U. S. Attorneys had interviewed him, and had taken some fragmentary, nonverbatim notes. Mr. Copelin's interviews were not recorded, and he signed no statements. Both defense counsel and the Assistant U. S. Attorney who prosecuted the

case knew Messrs. Copelin and Hubbard. Each expressed some doubt about what they would testify, and each expressed reluctance to call either as a witness. It was this that led to the court's offer.

The precise testimony of any potential witness cannot be known until it is had. Mr. Brener, Dr. Beasley's attorney up until the time he withdrew in November 1974, had interviewed Mr. Hubbard prior to trial. Mr. Garrison, trial counsel, chose not to interview Mr. Copelin because he believed that Mr. Copelin was a government informant. The decision not to interview him, and not to call either witness, whether wise or not, was a deliberate and strategic one. The defendant is not entitled to a new trial so that he may employ a different strategy. Because the proffered testimony was readily available at the time of trial, there is no newly discovered evidence within the meaning of Rule 33.

Rule 33 provides that a motion for a new trial, on any ground other than newly discovered evidence, shall be made within seven days of the verdict or finding of guilty. Because seven days have long passed, even as tolled by the filing of an appeal, the sole basis for the present motion must be newly discovered evidence. This evidence need not relate only to the question of innocence but may be probative of another issue of law, such as the existence of a *Brady* violation. However, because there is no newly discovered evidence within the meaning of Rule 33, (even on the *Brady* issue), defendant has not timely raised the issues he seeks to present. Nonetheless, to complete the record and to avoid the need for remand should the appellate court rule otherwise with respect to Rule 33, I shall consider the other issues on their merits.

### II.

The defendant contends that the government failed to tender the notes of interviews conducted with Messrs. Copelin and Hubbard as required by *Brady, supra.* These notes were made by three Assistant U. S. Attorneys during interviews with Mr. Hubbard on November 26, 1974, December

19, 1974, and January 7, 1975, and with Mr. Copelin on November 26, 1974, December 19, 1974, and January 27, 1975.

We pretermit the issue of whether prosecutor's cryptic notes made for his own use can ever be *Brady* material. We ignore the question of whether the defendant would have called either witness to testify if the notes had been made available; we pretermit whether Messrs. Copelin or Hubbard, or both, would have claimed the Fifth Amendment privilege if called to testify, as they both did when called to testify at the first new trial proceeding, and we overlook whether the claims of immunity would be sustained. Finally, we place no emphasis on the fact that the defendant never sought *Brady* material either before or after any trial, and not even prior to the present hearing during the course of which the material was produced at the court's instance. Regardless how these issues would be resolved, the notes are not exculpatory within the meaning of *Brady.*

For purposes of determining whether the government violated its *Brady* duty, it is immaterial that the government may have acted in good faith in failing voluntarily to produce the notes and whether the defendant requested the notes, if they are, in fact, exculpatory. However, the duty of the government under *Brady* can only be measured in terms of documents in the government's possession at the time that the *Brady* duty existed. Hence, we must focus on the content of the notes themselves, rather than the present testimony of Messrs. Copelin and Hubbard. Their testimony is not *Brady* material. Although it may be probative of whether *Brady* material existed, the contemporaneous notes represent more accurate descriptions of the statements made to the government than do the interviewees' belated recollections.

The notes are not exculpatory of Dr. Beasley. Although they do not confirm the testimony of other witnesses, jot by jot, in every detail, the portions of them that would favor Dr. Beasley or conflict with testimony of witnesses actually called at the trial are isolated items in a mass of incriminatory material. Construed most favorably to the defendants, the notes and the testimony indicate that Mr. Hubbard informed the prosecutors that his trip to New York was not an attempt to have Ronnie Moore set SEDFRE up as a conduit of money from the Family Health Foundation to Mr. Copelin. Additionally, he may have denied what other witnesses said about other incidents related to this particular transaction.

However, these particles of exculpatory evidence, even if believed, must be considered in the context of the total record. As the Supreme Court recently stated in *U. S. v. Agurs,* 1976, 427 U.S. 97, 96 S.Ct. 2392, 2401–2402, 49 L.Ed.2d 342:

. . . [W]e have rejected the suggestion that the prosecutor has a constitutional duty routinely to deliver his entire file to defense counsel, we cannot consistently treat every nondisclosure as though it were error. It necessarily follows that the judge should not order a new trial every time he is unable to characterize a nondisclosure as harmless under the customary harmless error standard. . . Unless every nondisclosure is regarded as automatic error, the constitutional standard of materiality must impose a higher burden on the defendant. . . . the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.

Only Count One of the indictment mentions the SEDFRE transaction. The other counts concern presentation of false claims including add-ons of approximately $4,400 on the purchase price of mobile-modular clinics. The total amount of the overcharges far exceeded the $50,000 allegedly passed to Copelin through SEDFRE. The total add-ons to the 27 mobile clinics was approximately $119,800. Additionally, $659,580 was allegedly claimed for 15 clinics that were never constructed. The only relevance of the SEDFRE transaction to the crimes for which Dr. Beasley was convicted is that, of the 32 overt acts alleged in Count

One of the indictment, two pertained to the transaction. Overt acts nine and fourteen alleged that co-defendant Oscar Kramer picked up checks from Dufrechou Engineering in the amount of $10,000 made payable to SEDFRE for ultimate delivery to a New Orleans consulting firm. It does not state that Messrs. Copelin or Hubbard were the consultants but, even if that implication is accepted, the conflicting testimony on this isolated episode has little material relation to the conviction of the defendant on the first count.

Additionally, the notes were in all other respects incriminatory, as was the prospective testimony of Messrs. Hubbard and Copelin. Accordingly, if Rule 33 permitted us to consider the *Brady* question anew, and the pretermitted issues were resolved favorably to the defendant, this court would nonetheless feel constrained to rule that the evidence was not exculpatory within the meaning of *Brady* and deny the new trial motion on that basis.

### III.

The defendant also contends that the prosecution misled defense counsel by their resume of Mr. Hubbard's prospective testimony. The resume stated in relevant part:

Copelin and Hubbard then flew up to New York and met with Ronnie Moore where Hubbard had to re-introduce Copelin to Ronnie Moore and eventually after discussion of the possibility of a contract between SEDFRE and Copelin and of a contract between SEDFRE and Family Health Foundation whereby SEDFRE would be used as the conduit of the money to Sherman Copelin; Ronnie Moore agreed to the arrangement.

The notes of the government's November 26, 1974, interview with Mr. Copelin state:

Copelin went to N.Y. w/ Don Hubbard to talk to Ronnie Moore—around October—November 1972! Sherman had conversations w/ Ronnie Moore—about getting help in setting up his own consulting firm in N.O. Moore talked about help etc. then it all fell together w/ FHF giving Sedfre $50,000 and they giving it to Copelin, etc.

When read in conjunction with the notes of the government's November 26, 1974, interview with Mr. Hubbard, it is apparent that the resume is a reasonably accurate summary of Mr. Hubbard's version:

*SEDFRE*—Ronnie Moore contact in 1972. Talking to Ronnie Moore at Mason's Motel etc. Told Moore he was working for FHF and possibly Sedfre could do some work for the FHF. Several months passed before the next contact with Moore on the Copelin transaction. Dr. Beasley said Sedfre was a good deal and Sedfre could do day care studies for FHF.

Then late one night in office—Kramer told Hubbard that Sedfre could get the day care contract but really didn't have to do any work since he [Oscar] had done all the work—Oscar already had plans etc. for day care center etc. Moore said allright if he could see the plans and approve them.

Hubbard had been asking Moore to help Sherman [Copelin] get started—[thus] the money from Duf. to Sedfre to Copelin was no big deal etc.

Although the notes do not state that the agreement was made in New York or that Messrs. Copelin and Hubbard flew to New York to execute the agreement, they do support the pith of the resume: the agreement was made. The defense would not be any more likely, or any less likely, to call Mr. Hubbard as a witness if it had read the government's notes.

There is testimony in the record that during the trial, Mr. Carriere, then prosecutor, indicated to Mr. Garrison, then defense counsel, that Mr. Hubbard's testimony was a "mixed bag." If this description was misleading, it misled only by exaggerating the positive aspects of Mr. Hubbard's testimony. Indeed, Mr. Carriere testified at the hearing on this motion, "[I]t was my hope and expectation that Mr. Garrison *would call* [Copelin and Hubbard] as witnesses, because on cross-examination, I thought we could make a great deal of favorable evi-

dence for the government . . . ." (Emphasis supplied). As the trial judge, I became aware during the colloquy between Mr. Carriere and defense counsel that Mr. Carriere wanted Mr. Garrison to call Messrs. Copelin and Hubbard. This was one of the factors that led to the court offer to call a witness as the court's witness, so that the defense could have their testimony without being put to whatever tactical disadvantage it might incur by calling them as its own witnesses.

Hence, the contention that Mr. Carriere misrepresented Mr. Hubbard's potentially favorable testimony as unfavorable is not only belied by the evidence itself, but by Mr. Carriere's motives at the time he provided the resume. Had he described the testimony any more favorably, the defendant might be contending, with considerable merit, that the government had deceived the defense into calling a witness who proved highly prejudicial to their case.

### IV.

Finally, the defendant contends that Mr. Carriere was aware that the testimony of Messrs. Copelin and Hubbard would be favorable to the defendant and that he had a constitutional duty to communicate that opinion to the defendants. It is contended that the prosecutor is obliged to disclose more than the totality of his files; he must disclose his mental state.

According to the court in *Agurs, supra,* 96 S.Ct. at 2399–2400:

The Court of Appeals appears to have assumed that the prosecutor has a constitutional obligation to disclose any information that might affect the jury's verdict. That statement of a constitutional standard of materiality approaches the 'sporting theory of justice' which the Court expressly rejected in *Brady.*

&ast; &ast; &ast; &ast; &ast; &ast;

Whether or not procedural rules authorizing such broad discovery might be desirable, the Constitution surely does not demand that much. . . . [As] Chief Justice Traynor of the California Supreme Court has pointed out . . . [government agents] are under no duty to report sua sponte to the defendant all that they learn about the case and about their witnesses. *In re Imbler,* 60 Cal.2d 554, 35 Cal.Rptr. 293, 301, 387 P.2d 6, 14 (1963).

The danger of a prosecutor's describing to defense counsel his impressions of what a witness would be likely to testify is indicated by Mr. Carriere's testimony that, in fact, he hoped the defense would call these witnesses. As noted, were he, even inadvertently, to exaggerate the favorable aspects of their testimony, or were they to testify different from his expectations, he might thereby cause the defendant to introduce damaging evidence, and he would stand accused of breaching his prosecutorial duties and setting a trap for the defendant. Hence, if a duty on the part of the prosecutor to disclose his own view of potential testimony could exist under any circumstances, it could not be found in the circumstances presented here.

There is no means for establishing with absolute certainty what impact, if any, the testimony of Messrs. Hubbard and Copelin would have had. This court cannot accurately hypothesize trials that did not occur. The defense had every opportunity to call them, their testimony was not concealed or misrepresented by the government, and the decision not to call them was a strategic and knowing one. Regardless whether the test of materiality employed in *Agurs,* or the standard of "critical evidence" applicable when the defense makes a specific request, *White v. Maggio,* 5th Cir. 1977, 556 F.2d 1352, is to govern, it is the view of this court, having heard these witnesses and reviewed the record in full, that the testimony of Messrs. Hubbard and Copelin would not induce reasonable doubt in the minds of the triers of fact.

Accordingly, the motion for a new trial is DENIED.