**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jairo Hernan PEÑA, Defendant–Appellant.**

**No. 90–2430.**

United States Court of Appeals, Fifth Circuit.

Dec. 16, 1991.

---

**68.** *Id.*

Salvador G. Longoria, Guadin & Longoria, New Orleans, La., for defendant-appellant.

Paula C. Offenhauser, Peggy M. Ronca, Asst. U.S. Attys., Ronald G. Woods, U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge,
WILLIAMS and BARKSDALE, Circuit Judges.

CLARK, Chief Judge:

Jairo Hernan Peña appeals his conviction on one count of aiding and abetting Miguel Munevar and others in possession with intent to distribute in excess of five (5) kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 18 U.S.C. § 2. Finding no error in the jury's verdict or district court procedures, we affirm.

## I. Background

### A. Facts

Jairo Hernan Peña owns a car repair shop called Keeper Classics, Inc. (Keeper Classics). On June 8, 1988, Miguel Munevar contacted Peña and requested he tow a green Suburban motor vehicle from an apartment complex. Peña contends that Munevar told him the doors were jammed and Munevar could not get into the car. The government asserts that Peña knew that the car contained stolen drugs and that he was assisting Munevar in the theft of 200 kilograms of cocaine from Colombian drug traffickers. Peña agreed to get the Suburban towed to his shop and included the cost in the repair bill. He phoned Gary Fattig, a tow truck driver, to request the tow at 3 p.m. Fattig responded that he would get to the Suburban within the hour.

Peña left Keeper Classics about 5:45 p.m. Fattig did not arrive with the Suburban until 6 p.m. Apparently Fattig did not remain long at Keeper Classics and drove away from Keeper Classics within a few minutes of his arrival. After making several turns and stopping briefly, Fattig returned to Peña's shop. He then towed the Suburban to American Storage, a car storage lot. Once at American Storage, Fattig and Rick Edwards, assistant manager of the storage lot, discovered that the Suburban contained bricks of cocaine. Edwards called the Houston Police Department (HPD) who arrived on the scene around 7 p.m. When the HPD arrived at American Auto Storage, the officers observed bricks of cocaine in the Suburban. One brick was open and the contents were spilling out. HPD notified the Drug Enforcement Agency (DEA) when inspection revealed a DEA transponder on the Suburban. The HPD

took Fattig and Edwards to the station for questioning.

Peña testified that Munevar called him at home around 10 p.m. the evening of the 8th, inquiring about the Suburban. Peña agreed to check at the shop after he stopped at the grocery store. When Peña went by the shop, the Suburban was not there. Peña paged Fattig several times within a fifteen-minute interval. Detective Wilson of the HPD testified that while he was interviewing Fattig that evening, Fattig's pager went off several times, showing Keeper Classics' phone number.

Upon returning to work the morning of June 9th, Peña again paged Fattig several times. Munevar again called Peña asking where the Suburban was. Fattig returned Peña's page under surveillance by law enforcement agents. Fattig stated that he had the Suburban but wanted to treat it as a repossession. When Peña informed Munevar of the additional cost, Munevar responded that money was no problem and apparently requested at that time that Peña keep his name out of the transaction. After a taped telephone conversation with Fattig, Peña created a false unpaid invoice on the Suburban. Peña admitted that there was no outstanding bill on the Suburban and that the entire invoice was a fiction. Peña used the name Fabio Montoya on the invoice. He knew Montoya was a wanted drug trafficker who would not be around.

That afternoon, Peña went to American Storage where he learned of the police hold on the Suburban. Peña did not demand possession of the Suburban and did not have any repossession paperwork with him.

That evening, around dinner time, Munevar arrived at Peña's home. Peña contends that it was during this conversation that he first became aware of the cocaine. Peña testified that Munevar told him of his plan to steal cocaine in which Cesar Ospina and the Ochoa family had an interest. Munevar accused Peña of involvement in the plan. Peña testified he expressed his anger at Munevar for getting him involved in

any way and rejected Munevar's offer of $20,000 to retrieve the Suburban.

Later that night, around 3 a.m., DEA Special Agent Michael McDaniel, Officer Nick Wilson, and Agent Cummins arrived to arrest Peña.[1]

The evidence as to what Peña told the arresting officers at this point is contradictory. Peña testified that when the officers first arrived he said, "Oh Mike, you are here about the truck, aren't you?". The officers testified that they read Peña his rights and took him to the HPD station for questioning. McDaniel testified that during the station interview, Peña admitted that he and Munevar schemed to steal the cocaine from Ospina and that Peña would receive $20,000 in return for arranging the tow. Peña denies making such statements.

### B. Proceedings

Peña's indictment contained two counts. Count one charged Peña with conspiring to possess with intent to distribute in excess of five (5) kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Count two charged Peña with aiding and abetting Miguel Munevar and others in possession with intent to distribute in excess of five (5) kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2.

Both parties filed numerous pre-trial motions. The jury returned a not guilty verdict as to count one and a guilty verdict as to count two. Peña filed a motion for a new trial immediately following the verdict. Four months later Peña filed an amended new trial motion alleging newly discovered evidence. The court denied the motion as amended and sentenced Peña to 120 months followed by 5 years supervised release, a $5,000 fine and a special assessment of $50. Peña appeals.

### II.

Peña raises four issues on appeal. First, whether there is sufficient evidence that Peña had knowledge of the unlawful pur-

---

**1.** McDaniel and Peña were acquaintances in October 1987 when McDaniel approached Peña about assisting the DEA with another investigation.

pose of the tow at any time when he had constructive possession of the Suburban. Second, whether the district court erred in admitting evidence of McDaniel's handwritten notes which were prepared 12 hours after the interview with Peña. Third, whether the jury instruction on deliberate ignorance was improper because the government's case focused on Peña's actual knowledge. Fourth, whether the newly discovered evidence of Fattig's drug problems warranted a new trial.

*A. Sufficiency of the Evidence*

■ The jury found Peña guilty of aiding and abetting the possession with intent to distribute in excess of five (5) kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 18 U.S.C. § 2. The crime of aiding and abetting occurs when a defendant associates with a criminal venture, purposefully participates in it, and seeks by his actions to make it succeed. *United States v. Vaden,* 912 F.2d 780, 783 (5th Cir.1990). The government does not need to prove each element of the crime, only that Peña aided and abetted that crime. *United States v. Stanley,* 765 F.2d 1224, 1242 (5th Cir.1985).

■ When reviewing a verdict for sufficiency of evidence, this court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Santisteban,* 833 F.2d 513, 516 (5th Cir. 1987).

■ Peña argues that because the jury found him not guilty of conspiracy, no reasonable trier of fact could then find him guilty of aiding and abetting. In order to return a verdict of not guilty of conspiracy, Peña contends that the jury necessarily discredited Peña's alleged confession to McDaniel on June 10th and also the additional circumstantial evidence of Peña's actions on June 9th. Therefore, Peña asserts, the same evidence cannot support a

guilty verdict for aiding and abetting. We disagree.

■ First, we note that the crimes of conspiracy and aiding and abetting are separate and distinct. A person may aid and abet the commission of a crime without being a conspirator. *See United States v. Bright,* 630 F.2d 804, 813 (5th Cir.1980); *United States v. Krogstad,* 576 F.2d 22, 29 (3rd Cir.1978). "The essence of a conspiracy offense is proof of knowledge of and voluntary participation in an agreement to violate the law, whereas aiding and abetting requires that there be a 'community of unlawful intent' between the aider and abettor and the principal." *United States v. Phillips,* 664 F.2d 971, 1010 (5th Cir. 1981) (cites omitted), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). Second, even if the counts were overlapping, the law does not require consistency of verdict between the separate counts. *United States v. Powell,* 469 U.S. 57, 65, 105 S.Ct. 471, 476, 83 L.Ed.2d 461 (1984); *United States v. Montalvo,* 820 F.2d 686, 690 (5th Cir.1987). Inconsistent verdicts may simply be a reflection of the jury's leniency. *Montalvo,* 820 F.2d at 690.

■ Viewed in the light most favorable to upholding the verdict, we find the evidence to be sufficient. Such evidence must support a finding that Peña's intent to aid and abet Munevar existed prior to Fattig's transfer of the Suburban to the storage lot. After this point, Peña could no longer aid or abet Munevar in the illegal possession of the cocaine because Fattig had deviated from his agency and was no longer the agent for Peña and the HPD hold on the Suburban had ended any prior possession by Munevar or Peña. Peña's guilty knowledge, however, did not have to coincide with his own constructive possession of the cocaine. A conviction for aiding and abetting the possession of a controlled substance with intent to distribute does not require that Peña have actual or constructive possession of the drug. It only requires that Peña associate himself with the venture, and participate in a way calculated to bring about that venture's success. *See*

*United States v. Raper*, 676 F.2d 841, 850 (D.C.Cir.1982).

Peña's actions subsequent to 7 p.m. on June 8th may demonstrate that Peña associated with a criminal venture prior to 7 p.m. The question is whether the evidence and reasonable inferences therefrom show that, through actual knowledge or deliberate ignorance, Peña knew that the Suburban contained cocaine at the time he agreed to have the vehicle picked up. Peña does not question the proof that he requested the tow or that Munevar and others were involved in the illegal possession of cocaine with intent to distribute.

Peña testified that Munevar requested the tow because the doors were jammed and he could not get into the car. Peña was a person who repaired cars. The fact that he sent a wrecker to tow a multi-doored vehicle on which doors were jammed would raise reasonable doubts about whether the request was genuine and whether it came from the rightful owner who had a key to the doors of the vehicle. The jury could reasonably infer that jammed doors were not the real reason for the tow request. The jury also was entitled to deduce that if Munevar had concealed cocaine in the Suburban without Peña's knowledge, Munevar had to realize Peña would discover the cocaine as soon as he attempted to repair the doors. This is further emphasized by the evidence showing Edwards detected a strong chemical odor as soon as he opened the doors, which he found were not jammed.

Peña's behavior on the night of June 8th and the morning of the 9th also supports a jury's finding that he was previously aware of the Suburban's contents. Late at night on the 8th, Peña, acting in response to a phone call from an agitated Munevar, stopped by the shop to check for the Suburban's delivery. Peña then waited 15 minutes at the shop and paged Fattig several times. The next morning, Peña continued to page Fattig. The jury could infer Peña's efforts to contact Fattig and his conversations with him demonstrated an unreasonable urgency to get possession of the Suburban. If Peña had been unaware of the Suburban's cocaine cargo, he would not have been so agitated with Fattig, nor willing to falsify an invoice in order to regain possession of the motor vehicle. The jury could reasonably infer from Peña's testimony alone that he knew all along that the Suburban contained cocaine.

Peña's alleged statements made to Officer McDaniel on June 10th also support the jury's verdict. McDaniel testified Peña admitted that at all times he knew of and was assisting Munevar's effort to obtain the cocaine by towing the Suburban from its apartment complex location to Keeper Classics. To the contrary, Peña testified that Munevar did not offer the $20,000 until Peña notified him the police held the car. The jury was free to determine the credibility of each witness and find against Peña's version of the events and his lack of knowledge of illegality.

Even if the jury found Peña had no actual knowledge of the contents, it could have found that Peña deliberately remained ignorant of Munevar's criminal activity. *United States v. Lara–Velasquez*, 919 F.2d 946 (5th Cir.1990). Peña was not present when the Suburban arrived and he gave inconsistent stories to account for his absence. He testified that on the afternoon of June 8 he left to pick up his daughter, but he told Fattig that he was ill then. Peña testified that Munevar always paid cash for work done on his expensive cars, a BMW, Nissan Turbo, Porsche and Mazda RX7, regardless of the amount due. Peña's absence from Keeper Classics after requesting Fattig to bring the Suburban there, coupled with his knowledge of Munevar's unusual cash dealings and the alleged offer of $20,000 for a simple automobile towing job all would support a finding of deliberate ignorance.

Peña contends that the evidence does not support a verdict of guilt beyond a reasonable doubt. This might be true if the jury believed Peña's story and rejected the other evidence, however, "determining the weight and credibility of evidence is the special province" of the jury. *United States v. Johnston*, 685 F.2d 934, 937 (5th Cir.1982), *cert. denied*, 460 U.S. 1053, 103

S.Ct. 1501, 75 L.Ed.2d 932 (1983). The evidence presented at trial is sufficient to support a verdict of guilty in aiding and abetting in the possession with intent to distribute in excess of five (5) kilograms of cocaine.

### B. Government Exhibit 32

■ Government Exhibit 32 is DEA Special Agent McDaniel's handwritten notes of Peña's interview subsequent to his arrest on June 10th. The district court admitted the notes over the objection of defense counsel. The district court has wide discretion in determining relevancy and we will not overrule it absent an abuse of discretion. *United States v. Brown,* 692 F.2d 345, 349 (5th Cir.1982). Peña argues that the district court abused its discretion because the notes are inadmissible under all Federal Rules of Evidence. We disagree.

Federal Rule of Evidence 801(d)(1)(B) excepts from the definition of hearsay a declarant's prior consistent statement "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." FED. R.EVID. 801(d)(1)(B). "If the opposite party wishes to open the door for its admission in evidence, no sound reason is apparent why it should not be received generally." FED. R.EVID. 801 advisory committee's notes. Peña opened the door regarding McDaniel's final report and testimony by insinuating that McDaniel may have inserted facts he learned *after* his interview with Peña. Defense counsel questioned McDaniel on his familiarity with interview techniques and why certain techniques, such as tape recordings or witness statements, were not employed. Counsel also continually reiterated that the final police report is dated 17 days after Peña's arrest on June 10th. Defense counsel clearly intimated that McDaniel may have attributed his own knowledge of the drug operation to Peña. Peña opened the door as to the validity and authenticity of the final report. The court did not abuse its discretion in admitting into evidence McDaniel's notes to demonstrate that his testimony correctly reflected Peña's statements at the interview.

### C. Jury Instruction on Deliberate Ignorance

■ Next, Peña contends that the court erred in submitting a deliberate ignorance instruction over his objection. We disagree.

■ In assessing Peña's instruction challenge, this court must review the instructions in their totality and view the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Chen,* 913 F.2d 183, 186 (5th Cir.1990). We must determine whether the deliberate ignorance instruction "clearly instructs jurors as to the principles of law *applicable to the factual issues confronting them."* *United States v. Lara–Velasquez,* 919 F.2d 946, 950 (5th Cir.1990) (cites omitted).

The district court instructed the jury that:

> The word "knowingly" or "willfully" in these instructions means that the act was done voluntarily and intentionally and not because of mistake or accident. A defendant still can be found to have acted knowingly if that defendant closed his eyes on purpose to avoid learning all the facts.

Peña argues that giving such an instruction is error if the evidence tends to establish the defendant's actual knowledge and direct involvement in the criminal activity. Peña is incorrect. "Even if the government's case was actual knowledge, the defendant's testimony raised the issue of deliberate ignorance." *Chen,* 913 F.2d at 192. Peña testified that he was unaware of the cocaine until the evening of June 9th. He raised the issue of ignorance. The evidence supports a finding that such ignorance was deliberate.

Peña was not present when Fattig attempted delivery of the Suburban. Peña can no more avoid criminal liability by absenting himself than by refusing to know he was participating in a criminal endeavor. The jury could have found, based on the evidence, that Munevar offered Peña $20,-

000 to tow the Suburban because it had jammed doors. Peña testified that Munevar, who Peña knew associated with drug traffickers, always paid cash for work done on expensive cars. Peña could not avoid liability by choosing not to learn the illegal nature of his participation in Munevar's activities.

The evidence would support a jury's finding that Peña consciously avoided "positive knowledge of a fact ... choosing to remain ignorant so he can plead lack of positive knowledge in the event he should be caught," *Lara–Velasquez*, 919 F.2d at 951 (cites omitted). The jury instruction on deliberate ignorance was permissible, if not required, in this case. Giving it was not error.

### D. Motion for New Trial

Peña challenges the district court's denial of his motion for a new trial based on newly discovered evidence. Motions for new trials based on newly discovered evidence "are disfavored by the courts and therefore are viewed with great caution." *United States v. Fowler*, 735 F.2d 823, 830 (5th Cir.1984). We will reverse a denial of a motion for new trial only when there is a clear abuse of discretion. *Id.; United States v. Lopez–Escobar*, 920 F.2d 1241, 1246 (5th Cir.1991). We find no abuse of discretion here.

A defendant moving for a new trial based on newly discovered evidence must show that:

1) The evidence is newly discovered and was unknown to the defendant at the time of trial;
2) Failure to detect the evidence was not due to lack of due diligence by defendant;
3) The evidence is material, not merely cumulative or impeaching; and
4) The evidence will probably produce an acquittal.

*See Lopez–Escobar*, 920 F.2d at 1246; *cf.* Fed.R.Crim.P. 33. Failure to satisfy one part of this test requires denial of the motion for new trial. *Fowler*, 735 F.2d at 831.

The newly discovered evidence proffered by Peña concerned the actions of the tow truck driver, Fattig. In support of his motion, Peña presented evidence that Fattig had a continuing drug problem and that together with Edwards, Fattig stole 150 kilograms of cocaine from the Suburban prior to calling the HPD. Therefore, Peña argues, Fattig had a motive for diverting attention from himself to Peña.

Applying the four part test above, we find that the district court did not abuse its discretion in denying the motion for new trial. First, Peña was aware prior to trial that Fattig had failed to pass a polygraph test. At trial, if not before, Peña learned of Fattig's drug and alcohol problem.

Second, this evidence of Fattig's alleged drug problem and theft could have been detected through due diligence. Peña asserts that he did not seek to discover this evidence because the government misled him into believing Fattig would testify at the trial. Peña did attempt to contact Fattig but Fattig was uncooperative. Peña argues that he could not discover this new evidence because Fattig was not called as a witness. This argument, however, is inconsistent with Peña's support of his new trial motion with the affidavit of Charles Ford, a private investigator, and statements made by Mrs. Fattig and John Walker, Mrs. Fattig's friend. Whether Fattig was uncooperative and unavailable did not preclude Peña from making a timely investigation of Fattig's actions or from interviewing Mrs. Fattig, Walker or Edwards. Peña does not sufficiently explain why Ford was able to discover this evidence only after the trial.

Third, the evidence is not material and goes merely to impeach Fattig. Peña argues that the evidence would have cast a reasonable doubt on the conversations between Fattig and Peña. Peña contends that the evidence would undercut Fattig's credibility. If Fattig had testified, this evidence may have impeached him. Evidence which merely discredits or impeaches a witness' testimony does not justify a new trial. *See United States v. Johnson*, 596 F.2d 147, 149 (5th Cir.1979). *A fortiori* potential impeachment of a non-witness is insuf-

ficient. The evidence has no other materiality, it does not rebut any of the physical evidence.

Last, this evidence would not lead to an acquittal. The evidence would not raise a reasonable doubt as to guilt. *See United States v. Snoddy*, 862 F.2d 1154, 1156 (5th Cir.1989). Fattig's alleged actions in stealing the cocaine occurred after Fattig and Edwards had terminated Peña's involvement. Whether Fattig is also engaged in illegal activity does not detract from the evidence that Peña aided and abetted Munevar in the possession with intent to distribute in excess of five (5) kilograms of cocaine. Even if the jury were to totally discredit Fattig's behavior, it could still find Peña guilty, based on Peña's own actions and statements and the remaining unaffected testimony.

### III.

The judgment of the district court is AFFIRMED.