# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 22, 2011

No. 10-40675

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellant

v.

CHAD ALLEN PIAZZA,

Defendant–Appellee

Appeal from the United States District Court
for the Eastern District of Texas

Before DAVIS, PRADO, and OWEN, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Defendant–Appellee Chad Piazza was convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). At trial, the Government presented evidence that Chad sold two firearms to Robert Newsom. Shortly after sentencing, Chad filed a motion for new trial on the basis of newly discovered evidence that his brother, Jed Piazza, was the individual who sold Newsom the firearms. After a hearing on the motion, the district court granted a new trial, finding that the defendant had satisfied all five factors of the *Berry* rule. The Government filed this appeal. We affirm the district court's grant of a new trial.

No. 10-40675

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.    Facts

On August 30, 2008, the residents of a house in Port Neches, Texas, evacuated due to Hurricane Gustav's anticipated landfall.  When they returned on September 2, they found their home had been burglarized.  A rifle and a shotgun were among the items stolen.

Sometime around September 4 to 6, Robert Newsom received a phone call from a man who offered to sell Newsom firearms.  Later that day, a white male and female drove to Newsom's house with a rifle and a shotgun.  Newsom told the pair that he does not purchase stolen property.  The woman told Newsom that the firearms belonged to her dead father and that they were selling the firearms because they needed the money.  Newsom paid $175 for the guns.  The call made to Newsom earlier in the day was later found by the police to have come from a phone belonging to Jed Piazza ("Jed"), the brother of Chad Piazza ("Chad").

Four to six days later, on September 10, Newsom called the Groves[1] Police Department and spoke with Deputy Ronald Anders.  During the call, Newsom stated that he had read a newspaper report about the Port Neches burglary and that he had possibly bought the two firearms that had been stolen in the burglary.  Newsom said that he bought the guns from an unknown white female and a white male, and "that he wasn't sure of [the male's] name, but . . . [the male] was one of the Piazza boys" and "he was bald and all tatted up."

Shortly after Newsom's call, the Groves Police Department presented him with a photo array that contained the picture of Chad as one of six men.  Jed was not in the lineup.  Newsom identified Chad, but stated that the man did not have hair at the time of the sale as he did in the picture.  Newsom was also shown a

---

[1] Groves, Texas is a neighboring town to Port Neches.

photo array of six women. He could not identify the woman who accompanied the white male on the day of the sale.

Newsom, however, independently followed up on a piece of information that the woman had given him on the day of the sale. The woman had stated that she used to "be a brother-in-law [sic] to one of [Newsom's] neighbors down the road." Newsom asked the Martins, who lived down the road, who she could be, and the Martins informed Newsom that her name was Sandy Kelly[2]. Newsom informed the police department. Based on this lead, the police detained Sandy Guilbeaux. Law-enforcement officers interviewed Guilbeaux, who admitted her involvement and gave a written statement.

At trial, Newsom testified that he personally knew only three of the Piazza boys: Jed, Chad, and Steve "Bubba" Piazza ("Steve"). Newsom stated that at the time he bought the guns from the couple, he had not seen Chad since he was a child. He further testified that the man who sold him the guns, whom he identified as Chad, had a freshly shaven head and tattoos all over his neck and arms. Newsom could not recall if the individual had tattoos on the shoulder.

Guilbeaux is the wife of Jed. Guilbeaux testified for the Government during Chad's trial. According to Guilbeaux, around the time of Hurricane Gustav, Chad picked her up in Jed's car, which looked like a "police car," and asked for her help in selling some guns. She first testified that Chad's hair at the time was not completely shaved and that "it had things in it," but that "it was not long." After refreshing her recollection by reading her written statement to police, she testified that Chad's hair had been "short and bald" and that it was the first time she had seen Chad's hair clean-shaven. Guilbeaux alleged that they drove to Newsom's home and that Chad asked her to tell Newsom that her father had killed himself with the gun. She said she stayed in

---

[2] Sandy Kelly is also known as Sandra Guilbeaux and Sandy Piazza.

No. 10-40675

the car until it was time to collect money from Newsom, and then she gave the money to Chad.

Several times, Guilbeaux equivocated in her testimony on cross-examination. On direct examination, she stated that Chad had never been angry with her for falsely accusing him of something, but later admitted on cross-examination that Chad told her the day before that "it was Jed you were with[,] not me" and that Chad had previously told her that she was falsely accusing him. Additionally, despite her testimony that Chad was the person who went with her to Newsom's house with the gun, she acknowledged on cross-examination that in a conversation with Shirley Piazza ("Shirley"), Chad and Jed's mother, she "could have told [Shirley] that it wasn't Chad [she was] with the day [she] sold the firearms" but that she could not recall. She stated that her lack of memory may be the result of her prescription medication use and psychological issues. She also testified that she was nervous during her testimony because she had never been in a courtroom before, but later admitted on cross-examination that she had been in a courtroom when she was convicted of theft.

Shirley testified that Guilbeaux told her that the police had questioned her, and that the questioning "dr[ove] her crazy because she didn't have her medicine." Shirley recounted that Guilbeaux told her that the police "went over and over it with her until she just kind of was losing it, so she just finally said, yes, it was Chad." But, Shirley testified that Guilbeaux told her, "Mama, it was really Jed."

On November 19, 2009, after a two-day trial, the jury found Chad guilty of having been a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). On May 11, 2010, the district court sentenced him to thirty-three months of imprisonment and two years of supervised release.

4

## B.    Motion for a New Trial

On May 18, 2010, Chad filed a motion for a new trial, asserting that there was newly discovered evidence in the form of proffered testimony of one of his brothers, Darrin Piazza ("Darrin").  Attached to the defendant's motion was an affidavit from Darrin, dated May 11, 2010, which stated:

> About a year and a half ago in 2008, I was staying the night at my mother Shirley Piazza's house . . . . Around 9:00PM, my brother, Jed Piazza and his common law wife Sandy arrived in a blue colored sedan that looked like an old police car.  Jed drove that type of vehicle during hurricane evacuations so he would not be stopped by police.  At this time, I was outside smoking cigarettes with one of my other brothers, Steve "Bubba" Piazza. Jed told Steve that he had some guns in the trunk of their car that they wanted to sell.  Steve told Jed that he knew of a guy that purchased guns from him in the past but this buyer would not buy stolen guns.  Upon hearing this, Sandy, Jed's common law wife, said that the guns were her father's.  Jed then called this person's phone number he got from inside a spiral notebook Steve had of everyone's numbers.  I believe this person's name is Robert Newsome [sic]. I have heard of Steve selling Mr. Newsome things in the past.  After making that phone call, Jed left and that was the last I knew about it.  A few minutes later, Chad Piazza, one of my brothers, showed up at my mom's trailer.  He did not go with Jed and Sandy.  I was arrested a few months later for a parole violation.  After I saw him that night, Jed told me that he might be in trouble because somebody turned some guns in and he might have "fu**ed" up.
>
> I am just now making this affidavit because I have been incarcerated on the parole violation and no one told me Chad had been arrested and went to trial for selling those guns to Mr. Newsome until I was released after his trial.  The only person I communicated with in jail was my wife.  She told me Chad was in jail but never said why.  Currently, I am on eighteen months house arrest but I will testify in court if I need to.

Chad argued that the evidence was newly discovered and unknown at the time of the trial and that failure to detect the evidence was not due to a lack of diligence.  Because Darrin was incarcerated for his parole violation, Chad asserted that Steve was the only person who would have known Darrin was a

No. 10-40675

possible witness. Chad noted that his initial appointed counsel, Assistant Public Defender Gary Bonneaux, attempted to contact Steve. Steve refused to speak with Bonneaux, and other family members advised Bonneaux that Steve would refuse to testify or discuss the case. Chad also argued that the evidence was material and would probably produce an acquittal because it provided both an alibi for Chad and evidence that it was Jed, not Chad, that sold Newsom the weapons. Further, Chad argued that the evidence was not merely cumulative and impeaching because the proffered testimony provides discrete details as to actions Jed took the day he sold the guns to Newsom; places the guns in Jed's vehicle; it shows that Jed called Newsom to sell him the guns; and it connects Jed and Newsom.

The district court held an evidentiary hearing on the motion on June 17, 2010. Bonneaux testified that Shirley mentioned Steve as a potential witness. Shirley told Bonneaux that Steve was adamant that Chad did not do it, and that Chad had been with "us"—meaning with Steve—at the time of the transaction. Bonneaux also testified about his extensive efforts to locate Steve, and offered his opinion that it would not have been wise to serve a subpoena on an uncooperative witness like Steve. He additionally testified that he had no knowledge that Darrin was a potential witness before he was replaced as appointed counsel by Zack Hawthorn. Darrin's testimony was consistent with his affidavit.

## C.    District Court's Order

On July 12, 2010, the district court entered an order granting the motion for a new trial. It agreed that the evidence was newly discovered and unknown to Chad at the time of the trial. The district court further held that the failure to detect the evidence was not due to a lack of diligence on the part of Chad, noting that Steve had consistently refused to speak with defense counsel and that it was merely speculative that he would have offered testimony about the

meeting or led the defendant to Darrin. The district court also found that the evidence was not merely cumulative or impeaching because Darrin would have provided actual evidence, rather than mere argument, that (1) Guilbeaux lied to protect Jed; (2) Jed was in possession of the firearms; (3) Jed sought out Steve to find a potential buyer; and (4) he was present at a phone call to Newsom. Finally, the district court found that the evidence was material and would probably produce an acquittal. The Government timely appealed.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 18 U.S.C. § 3731, which provides that the Government may appeal the grant of a new trial after the verdict or judgment provided that the double jeopardy clause of the U.S. Constitution does not prohibit further prosecution. Double jeopardy is not implicated here.

We review a district court's decision to grant or deny a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 for an abuse of discretion.[3] *United States v. Wall*, 389 F.3d 457, 465 (5th Cir. 2004) (citing *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997)). We are "necessarily deferential to the trial court because the appellate court has only read the record and, unlike the trial court, did not see the impact of witnesses on the jury or observe the demeanor of witnesses." *Id.* We review questions of law de novo. For mixed questions of law and fact, we review the underlying facts for an abuse of discretion, but the conclusions to be drawn from those facts de novo. *Id.* (citing *O'Keefe*, 128 F.3d at 893–94).

---

[3] Whether we review a grant or denial of a motion for a new trial under a *clear* abuse of discretion standard or a mere abuse of discretion standard is an unsettled question. *Compare United States v. Franklin*, 561 F.3d 398, 405 (5th Cir. 2009) (applying an abuse of discretion standard to a denial of a motion for a new trial), *and United States v. Baystank (Houston), Inc.*, 934 F.2d 599, 617 (5th Cir. 1991) (reviewing a grant of a motion for a new trial for mere abuse of discretion), *with United States v. Freeman*, 77 F.3d 812, 817 (5th Cir. 1996) (applying a clear abuse of discretion standard to a denial of a motion for a new trial)*, and United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005) (applying a clear abuse of discretion standard for review to a grant of a new trial). As our holding in this case would be the same under either standard, however, we decline to decide the issue here.

## III.  DISCUSSION

Federal Rule of Criminal Procedure 33 permits the district court to "vacate any judgment and grant a new trial if the interest of justice so requires."  FED. R. CRIM. P. 33(a).  Generally, motions for new trial are disfavored and must be reviewed with great caution.  *Wall*, 389 F.3d at 467;  *United States v. Gresham*, 118 F.3d 258, 267 (5th Cir. 1997) (citing *United States v. Jaramillo*, 42 F.3d 920, 924 (5th Cir. 1995), and *United States v. Peña*, 949 F.2d 751, 758 (5th Cir. 1991)).  To receive a new trial under Rule 33 for newly discovered evidence, the defendant must satisfy the prerequisites of what is commonly referred to as the *Berry* rule: (1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the failure to detect the evidence was not due to the defendant's lack of diligence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence if introduced at a new trial would probably produce an acquittal.[4]  *Wall*, 389 F.3d at 467; *Berry v. Georgia*, 10 Ga. 511 (1851).  The motion must be denied if the defendant fails to demonstrate any one factor.  *Jaramillo*, 42 F.3d at 924–25.

### A.     Newly Discovered Evidence Unknown at Trial

The parties and district court agree that Chad was unaware that Darrin had information regarding the case.  The Government argues, however, that the defendant's cross-examination of Guilbeaux indicates that the defense had at least some knowledge that Jed and Guilbeaux had gone to a relative's house to find out where Newsom lived.  The Government thus contends that the evidence was not newly discovered.  We disagree.

The Government failed to raise this argument in its response to the defendant's motion for a new trial or at the hearing on the motion in district

---

[4] The Fifth Circuit sometimes describes the *Berry* rule as having four, rather than five, factors.  *Compare United States v. Gresham*, 188 F.3d 258, 267 (5th Cir. 1997) (four-part test), *with Wall*, 389 F.3d 457, 467 (5th Cir. 2004) (five-part test).  Cases using the four-part test typically combine the element of materiality with whether the evidence is merely impeaching or cumulative.  *Wall*, 389 F.3d at 467 n.7.

court. Generally, we "will not consider for the first time on appeal an argument not presented to the district court." *United States v. Cates*, 952 F.2d 149, 152 (5th Cir. 1992) and cases cited therein; *see also United States v. Villarreal*, 920 F.2d 1218, 1222 (5th Cir. 1991) ("Because [the appellant] did not raise this point before the district court, the issue is not preserved for appeal."). Thus, the Government has waived this argument.[5]

Because the Government has waived this issue, we may review for plain error. *See Puckett v. United States*, 556 U.S. 129, 129 S. Ct. 1423, 1428–29 (2009). We find no error here. On November 18, 2009, the defense asked Guilbeaux whether she and Jed went to a relative's house to find out where Newsom lives:

> Q. Did you and Jed ever go over to a relative's house to try and find Mr. Newsom?
> A. Do what?
> Q. Did you and Jed ever go to a relative's house to find out where Mr. Newsom lives?
> A. No.
> Q. You don't recall that?
> A. No.
> Q. Could that have happened and you just don't recall?
> A. I don't think so. Who is Mister what you're saying?
> Q. Do you know who Robert Newsom is?
> A. No.
> Q. You don't. How about Norman Newsom, do you know Norman Newsom?
> A. No.

The cross-examination questions do indicate that the defense was trying to develop a theory that Jed, rather than Chad, was the one who sold the guns to Newsom. The Government suggests that the questions are so pointed as to indicate that the defense had some knowledge of the contents of the encounter

---

[5] The Government states that it did not receive the relevant portion of the cross-examination record from November 18, 2009, and thus implies that it could not have asserted this argument in the district court because the relevant portions of the transcript were not available. This implication is without merit. The defendant attached the relevant portion of Guilbeaux's testimony from November 18, 2009, to its motion for a new trial.

between Darrin, Steve, and Jed. These questions, however, are logical questions to ask based on the evidence adduced at trial that Steve had sold guns to Newsom prior to Hurricane Gustav, and that a phone call had been made to Newsom from Jed's phone during the period of time in which the firearms transaction took place. They do not indicate that the defense knew of Darrin's presence at the encounter between Jed and Steve or the contents of that conversation. The evidence was newly discovered and was unknown to the defendant at the time of trial.

## B.    Due Diligence

The Government argues that the district court erred in finding that the failure to detect the evidence was not due to a lack of diligence on the part of the defendant. It argues that (1) the defense should have demonstrated that it tried to obtain evidence about their suspicion that Jed and Guilbeaux went to Steve to contact Newsom; (2) the defense failed to supply a plausible reason as to why they could not have interviewed or subpoenaed Steve to explore the possibility of an alibi for Chad and potentially discover that Darrin was a possible witness; and (3) the defense should have interviewed Darrin given that Newsom stated that he had purchased the gun from "one of the Piazza boys" and Darrin was not incarcerated until after the sale to Newsom.

Although there is no case directly on point, two cases—*Beasley v. United States*, 582 F.2d 337 (5th Cir. 1978) (summary calendar), and *United States v. Peña*, 949 F.2d 751 (5th Cir. 1991)—are factually similar to the instant case and provide insight as to the nature of a due-diligence analysis.[6] In *Beasley*, we upheld the denial of a motion for a new trial based on newly discovered evidence. 582 F.2d at 338. In that case, defense counsel knew both witnesses' identities, whereabouts, and availability, but did not know exactly what the witnesses

---

[6] It is important to note, given the abuse of discretion standard, that in both *Beasley* and *Peña*, we reviewed a *denial* of a new trial, whereas in this case we review a *grant* of a new trial.

would testify to on the stand. *Id.* at 338–39. Defense counsel decided not to interview one of the witnesses and not to call either witness. In affirming and adopting the district court's order denying the motion for a new trial, we held that "where a party fails to call a witness who was available during trial, the testimony of that witness cannot be considered newly discovered evidence." *Id.* at 389.

In *Peña*, the defendant was convicted of aiding and abetting others in possession with intent to distribute cocaine. 949 F.2d at 753. Peña was a car-repair shop owner who was hired by drug traffickers to repair a car containing stolen drugs. *Id.* Peña sought a new trial claiming that he had discovered new evidence that the tow-truck driver who towed the car to Peña's shop had a drug problem, and that with the assistance of another person, the tow-truck driver had stolen 150 kilograms of cocaine from a car. *Id.* at 758. Peña asserted that this gave the tow-truck driver motive to divert attention from his own crime to Peña. *Id.* He tried to contact the tow-truck driver, but he proved uncooperative. Peña relied on the Government to call the tow-truck driver as a witness, however the Government did not call the driver. *Id.* Among the many reasons for which we affirmed the district court, we held that the evidence of the tow-truck driver's drug problem and theft could have been detected through due diligence. *Id.* We held that even if the tow-truck driver was uncooperative or unavailable, this did not preclude Peña from making a timely investigation of the tow-truck driver's actions or from interviewing other witnesses who could have provided the same information. *Id.* We held that the defendant had failed to demonstrate due diligence in discovering this new evidence because he could have interviewed the tow-truck driver's wife, the wife's friend, or the person who allegedly helped the tow-truck driver steal the cocaine. *Id.*

Both *Beasley* and *Peña* are distinguishable from this case. *Beasley* differs in two key respects. First, the witnesses in that case were "readily available": "the trial judge . . . offered to call [them] as the court's witnesses if either the

government or defense desired it." *Beasley*, 582 F.2d at 339. Unlike in *Beasley,* the witnesses in this case, Steve and Darrin, were not readily available. Bonneaux testified during the hearing on the motion for a new trial that after Shirley mentioned Steve as a potential witness, he tried multiple times to reach Steve. He attempted to contact Steve by calling his daughter, Heaven, but was unsuccessful. Bonneaux and Jay Bennet, an investigator for the defense, visited Steve's home and left a card with Bennett's contact information when Steve did not answer. Bonneaux went to Shirley's home and spoke with Doug, another Piazza brother, who called Steve and unsuccessfully attempted to have him come to Shirley's house under the guise of painting something at the house. Doug also indicated to defense counsel that Steve would refuse to testify or cooperate. Defense counsel once again visited Steve's house, and no one answered. The defendant attempted to contact Steve multiple times and ultimately would have had to ask for a subpoena; thus, Steve was not "readily available" as a witness.

Our decision in *Beasley* is also distinguishable because Beasley's counsel knew the identities, whereabouts, and availability of *both* witnesses. *Id.* Chad only knew about Steve as a potential witness, but it is not Steve's testimony that is at issue here. It is *Darrin*'s testimony that the defense seeks to introduce in a new trial. There was no indication before or during the trial that Darrin had any knowledge relevant to this case. The defense, therefore, did not consider Darrin as a potential witness.

In *Beasley*, the defense counsel deliberately chose not to call the potential witnesses as a matter of strategy. *Id.* We held that the defendant was not entitled to a new trial "so that he may employ a different strategy." *Id.* at 338–39. Defense counsel here may have chosen not to subpoena Steve as a matter of strategy because he was uncooperative and it was uncertain what he would say.[7] Even if this was defense counsel's motivation, the fact remains that

---

[7] The defendant also argues that a subpoena would have been ineffective because defense counsel could not locate Steve and would not have known where to have the subpoena

the defendant did not discover until after the trial that *Darrin* had information beneficial to the defense or that he was involved in any way. Failing to interview or subpoena Darrin was not a part of the defendant's trial strategy.

The present case is also distinguishable from *Peña* in several key respects. First, in *Peña*, the defense counsel learned of the tow-truck driver's drug and alcohol problem "[at] trial, if not before." *Peña*, 949 F.2d at 758. Therefore, Peña failed to exercise due diligence when he did not inquire further into the driver's drug problems after they were discovered and during the course of the trial. *Id.* In the present case, Chad had no reason to know, during trial or before, that Darrin or Steve had information regarding a possible meeting between Steve, Darrin, and Jed.

Second, Peña mistakenly relied on the Government to call the tow-truck driver as a witness in order to obtain his testimony. *Id.* Chad, on the other hand, did not passively wait for the Government to call Steve as a witness. Defense counsel actively sought to contact Steve and made numerous attempts to contact him.

Third, Peña's private investigator discovered after trial that several people had information about the tow-truck driver's drug problem. *Id.* We found in *Peña* that the defendant could have discovered this information and interviewed these potential witnesses prior to trial. *Id.* Chad did not have any similar alternative means to attain the information. In this case, the defense knew that it was possible that Steve might have evidence beneficial to Chad's defense, but it was unclear what his testimony would be. Also, defense counsel attempted to contact Steve, and contacted Steve's brother and daughter in an attempt to reach Steve and obtain a statement.

As to the Government's third argument that the defense failed to exercise due diligence when it did not interview Darrin, the Government failed to raise

---

delivered.

13

this argument in its response or at the hearing in the proceedings below. Accordingly, the Government waived this argument. *See Villarreal*, 920 F.2d at 1222. Even if we were to consider this argument, it is unpersuasive. The Government first suggests that defense counsel should have interviewed all of the Piazza brothers, including Darrin—the implication being that Darrin could have been the one to sell Newsom the guns. But Darrin did not match the physical description given by Newsom of the man who sold him the guns. Though it is true that Newsom described the white male who sold him the guns as "one of the Piazza boys," he also described the suspect as being "bald and all tatted up." The brothers' mother, Shirley, described only Jed and Doug as being bald. Additionally, Darrin's name did not come up during the course of Bonneaux's investigation or at trial.

Due diligence is a highly factual inquiry. *See, e.g.*, *Wall*, 389 F.3d at 469–70; *United States v. Sullivan*, 112 F.3d 180, 183 (5th Cir. 1997); *United States v. Miliet*, 804 F.2d 853, 859 (5th Cir. 1986). The facts in the present case support the district court's conclusion that the defendant exercised due diligence. Defense counsel, through phone calls and visits to Steve's home, made multiple attempts to contact Steve and interview him. Defense counsel contacted Steve's family members. Bonneaux choreographed a ruse with the help of Doug to try and set up a meeting with Steve. These attempts, viewed in light of all the circumstances of this case, constitute reasonable efforts.

In light of our analysis in *Beasley* and *Peña*, we find that the district court did not err when it found that the defendant exercised reasonable diligence.

## C.    **Nature of the Evidence**

The Government asserts that defendant's defense was that his brother Jed sold the guns to Newsom and that the defendant presented testimonial evidence at trial that Guilbeaux lied to authorities about Chad to protect her husband, Jed. The defendant did present evidence that Jed (1) was bald and had tattoos; (2) was the common-law husband of Guilbeaux and that Guilbeaux may have

lied to protect him; (3) owned the phone that called Newsom shortly before the sale; (4) owned the car that the white male drove the day of the sale; and (5) had a history of burgling houses. The defendant, however, was unable to present evidence that placed the guns in Jed's actual possession or evidence, that Jed and Guilbeaux told Steve the same story about the guns belonging to Guilbeaux's father, or how Jed decided to call Newsom to arrange a gun sale. Nor was there evidence presented at trial that Jed stated that he "might be in trouble because somebody turned some guns in and he might have f\*\*ked up." The district court properly found that the evidence is not merely cumulative or impeaching.

## D.    Materiality

The district court found that the "evidence is certainly material as it goes to whether another person committed the acts of which the jury found [Chad] guilty." The Government argues that Darrin's testimony is immaterial because it does not controvert the eyewitness testimony of Newsom that Chad was the Piazza brother that sold the guns to Newsom. Though it does not directly controvert Newsom's testimony, it does greatly strengthen the defendant's argument that Jed, and not Chad, was the one who sold the guns to Newsom—an argument that the jury heard below and that a jury could properly consider in determining guilt or innocence in a new trial. The evidence is material.

## E.    Probability of Producing an Acquittal

The district court found that Darrin's proposed testimony would probably produce an acquittal for Chad because it connects Jed to the guns and to the phone call placed to Newsom. The district court determined that it was more likely than not that the Piazza brother who sold the guns to Newsom was Jed rather than Chad. We agree.

The defense had already presented or elicited testimonial evidence that: Chad and Jed had both been bald at times and have tattoos; Newsom had not

personally seen Chad or Jed before the day of the transaction since they were children; Guilbeaux had told Shirley that Chad did not do it and that it was really Jed; someone had used Jed's phone to call Newsom to set up a sale; and Jed had a history of burgling houses. Darrin's proffered testimony additionally establishes that: Jed had the guns in his possession; Jed had sought and received the contact information of Newsom as a potential buyer of the guns; Jed or Guilbeaux, who had accompanied Jed to meet Steve and Darrin, told Steve and Darrin the same story about where the guns had come from that Guilbeaux told Newsom at the transaction; and Jed had admitted he may be in trouble because somebody had turned in some guns. The totality of the new evidence could rise to the level of creating a reasonable doubt that Jed, and not Chad, was the person who sold the guns to Newsom. The district court did not err in finding that the new evidence would probably produce an acquittal.

## IV.  CONCLUSION

The district court did not abuse its discretion when it held that the defendant had satisfied all five *Berry* factors and granted defendant's motion for a new trial. We affirm.