**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 25, 2009

Charles R. Fulbruge III
Clerk

No. 07-10680

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

PEDRO FRANKLIN; JULIO ALEJANDRO-GONZALEZ; JAMES
ADAM GUEVARA, also known as James Adam-Guevara; ROSALIO
SALAZAR-RAMIREZ

Defendants-Appellants

Appeals from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, ELROD, and HAYNES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The four appellants were convicted and sentenced in the United States
District Court for the Northern District of Texas for crimes relating to their
roles in a Texas drug distribution conspiracy. They timely appealed.

I.

Investigations in early 2006 revealed that the appellants and others
had formed a drug conspiracy involving methamphetamine distribution and
transportation, mostly from Fort Worth, where the conspiracy was based, to

points in West Texas. After an undercover investigation and the preparation of search warrants, police initiated surveillance, and arrested the defendants on January 19, 2006.

On that day, Rosalio Salazar-Ramirez picked up a black gym bag of drugs from David Puente-Hernandez's apartment; Julio Alejandro-Gonzalez dropped by the apartment shortly thereafter; and when the police finally executed search warrants on the apartment, they found drugs and drug paraphernalia as well as Jose Fernando Garcia and Puente-Hernandez, present in the apartment. Puente-Hernandez cooperated with the police and, by cell phone, convinced Salazar-Ramirez, who did not yet know of the bust, to bring to the house payment for the drugs he had picked up earlier in the day. When Salazar-Ramirez arrived – with $24,400 wrapped in cellophane and hidden under his shirt – the police arrested him. They found a loaded 9mm pistol under the driver's seat when they searched the car he drove. Puente-Hernandez also placed calls to a supplier, Alejandro-Gonzalez, and arranged a meeting, at which Alejandro-Gonzalez was arrested. Puente-Hernandez also called for a meeting with San Angelo-based drug purchasers, whose agents (James Adam Guevara and Pedro Franklin) were arrested upon their arrival. More than ten thousand dollars were hidden on Franklin's person upon his apprehension.

On February 16, 2006, a federal grand jury in the Northern District of Texas charged the seven individuals mentioned above with crimes related to the drug distribution conspiracy. Three defendants (Garcia, Raul-Hernandez, and Puente-Hernandez) pled guilty and served as government witnesses. The remaining four defendants were charged under a superceding indictment, and

the case went to trial on February 12, 2007. At trial, undercover and other officers implicated the defendants in the conspiracy and introduced material evidence connecting each defendant to the conspiracy activities.

The co-conspirator Garcia testified at trial as to the involvement of Alejandro-Gonzalez, Salazar-Ramirez, Franklin, and Guevara in illegal drug distribution activities. He was not able to complete his testimony, however, nor were the other government witnesses, Raul-Hernandez and Puente-Hernandez, allowed to testify, because they violated the rule of sequestration – which the government neglected by failing to discuss it with their witnesses and by holding them together – speaking with one another during the lunch break after Garcia's morning of testimony. Once the violation was discovered, the court and defense extensively questioned all three men concerning the conversation, and the court refused to allow any further direct testimony from them after the violation.

On February 16, 2007, the jury convicted the four remaining defendants. It found each guilty of conspiracy to possess with intent to distribute 500 grams or more of methamphetamine[1] and additionally found Salazar-Ramirez guilty of possession of a firearm in relation to a drug trafficking case. The district court sentenced each of these defendants to five years of supervised release, in addition to imprisonment for 235 months (Alejandro-Gonzalez), 181 months (Salazar-Ramirez), and 151 months (Guevara and Franklin).

II.

---

[1] They were acquitted of charges as regards the distribution of cocaine.

## A. Sufficiency of Drug Conspiracy Evidence

The standard required to overturn a conviction on grounds of insufficiency is high: "whether any juror could reasonably find the evidence established guilt beyond a reasonable doubt."[2] The reviewing court construes all evidence and inferences in the light most favorable to the prosecution.

The conspiracy charges require the government to establish that a conspiracy to unlawfully distribute methamphetamine existed, that the defendants knew of the conspiracy, and that they intentionally joined and participated in it. To establish whether there was a "single conspiracy," which is an element challenged by Alejandro-Gonzalez and Franklin, courts look to "(1) the existence of a common goal or purpose; (2) the nature of the scheme; and (3) overlapping participants in various dealings."[3] This does not require that the participants in the conspiracy know the other participants, nor that each participate in every conspiracy action.

In this case, the single, charged conspiracy easily covers all of the appellants.[4] The evidence involves the testimony of undercover officers, a co-conspirator, and extensive surveillance and evidence discovered during the day of the bust. Sufficient evidence directly implicates each defendant in the illegal drug conspiracy.[5]

## B. Sufficiency of Firearm Conviction

---

[2] U.S. v. Tansley, 986 F.2d 880, 885 (5th Cir. 1993).

[3] U.S. v. Morris, 46 F.3d 410, 415 (5th Cir. 1995).

[4] *See, e.g.*, U.S. v. Morris, 46 F.3d 410, 414-417 (5th Cir. 1995), *vacated in part on other grounds by* U.S. v. Brown, 161 F.3d 256 (5th Cir. 1998) (en banc).

[5] *See* U.S. v. Wilson, 116 F.3d 1066, 1075 (5th Cir. 1997).

To support Salazar-Ramirez's firearm conviction, the government must have provided sufficient evidence for a reasonable jury to find that (1) the defendant committed a drug trafficking crime; (2) he knowingly used or carried the firearm; and (3) he did so during and in relation to the crime.[6] Salazar-Ramirez contests the sufficiency of the evidence as to the second and third elements.

As to the third element, Salazar-Ramirez notes that he did not take the weapon into the house with him when he entered to complete the drug transaction. But this is not required by the relevant statute. He carried a gun under the driver's seat when he drove to complete the transaction, and the fact that he did not retain immediate access to it throughout the time of the transaction cannot avail him.[7] It was natural to want additional protection when he was carrying, concealed on his person, a large amount of cash; and the mere fact that he did not carry the gun into his co-conspirator's house does not mean he could not be convicted of carrying the gun in the course of the unlawful drug activities.[8] (Salazar-Ramirez's brief on this point

---

[6] 18 U.S.C. § 924(c)(1)(A) (in relevant part, providing criminal penalties for "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of such crime, possesses a firearm").

[7] "Harlan's conviction under § 924(c)(1) was proper because he transported a firearm in relation to a drug transaction. It does not matter that the firearms at issue were in the trunk of Harlan's car." U.S. v. Harlan, 130 F.3d 1152, 1153 (5th Cir. 1997).

[8] *See* Muscarello v. U.S., 524 U.S. 125, 126-27 (1998) ("We hold that [924(c)(1)] . . . applies to a person who knowingly possesses and conveys firearms in a vehicle, including in the locked glove compartment or trunk of a car, which the person accompanies.").

cites language from a Sixth Circuit decision on this element;[9] but that decision has been overruled by later Supreme Court precedent, as that court has itself recognized.[10])

As to the second element, "[t]he 'carrying' requirement of Section 924(c) is met where a defendant operates a vehicle knowing the firearm is in the car."[11] Salazar-Ramirez claims that insufficient evidence exists for a reasonable juror to infer that he "knowingly" carried the weapon. He cites cases in which possession of the gun was otherwise admitted or demonstrated in meeting this element;[12] he notes that such further evidence is missing here. But in supporting his argument that the "knowing" element can be used to overcome a conviction, Salazar-Ramirez relies on cases in which drugs were well concealed – hidden compartment drug cases.[13] In such cases the courts may require more than mere presence of contraband in a car to support a conviction that included a "knowledge" element. These cases are not directly analogous, as this gun was not particularly concealed, and as there is no

---

[9] U.S. v. Riascos-Suarez, 73 F.3d 616 (6th Cir. 1996). The brief's other discussions of Sixth Circuit law are, of course, rendered similarly ineffective by the later Supreme Court case, *Muscarello*.

[10] *See* U.S. v. Nance, 40 F. App'x 59, 65 n. 6 (6th Cir. 2002) (unpublished) ("We note that *Riascos-Suarez* represents the old test for whether a firearm is carried in a vehicle. After *Muscarello*, the firearm no longer must be 'immediately available for use.'").

[11] U.S. v. Speer, 30 F.3d 605, 612 (5th Cir. 1994).

[12] *Harlan*, 130 F.3d at 1152-53; U.S. v. Still, 102 F.3d 118, 125 (5th Cir. 1996); *Speer*, 30 F.3d at 612.

[13] *See, e.g.*, U.S. v. Aguilar, 503 F.3d 431, 435-36 (5th Cir. 2007) (discussing hidden compartment doctrine); U.S. v. Ortega Reyna, 148 F.3d 540, 544-47 (5th Cir. 1998) (same); U.S. v. Resio-Trejo, 45 F.3d 907, 911-912 (5th Cir. 1995) (same).

argument that Salazar-Ramirez was possibly acting as an innocent, ignorant courier.

The hidden compartment cases support the use of circumstantial evidence as to knowledge, and such evidence is ample here. The police officer who found the gun testified that, when Salazar-Ramirez was in the vehicle, "[a]ll he would have to do was reach under the seat and he would have had immediate access to the gun." No evidence suggests that Salazar-Ramirez shared access to the car; indeed, he was apparently seen driving the same "red Dodge truck" earlier on the day in question, picking up the drugs for which he later in the day brought payment. And he was, of course, engaged in the dangerous business of large-scale contraband and currency transportation, a business in which guns are all but necessary tools of the trade. We recognize that most drivers or even owners of vehicles do not regularly check below the driver's seat, but again, we are not dealing with a potentially unwitting criminal. As Salazar-Ramirez ran his important and clearly criminal errands, a juror could reasonably infer that he was aware of the firearm conveniently close to hand. We do not establish a per se rule that a gun under a driver's seat will in all circumstances support an inference of knowledge, but under these circumstances, a reasonable juror could conclude that he was "knowingly" carrying the gun.

## C. Guevara's Cell Phone

Guevara challenges the pre-trial and trial handling of a cell phone confiscated by police and introduced as evidence against him.

This court reviews evidentiary rulings on a heightened abuse of discretion basis.[14] Even an abuse of discretion may not merit reversal if the error was harmless. Because the challenge here is on hearsay, the alleged error is non-constitutional. "Non-constitutional trial error is harmless unless it had 'substantial and injurious effect or influence in determining the jury's verdict.'"[15]

Guevara's challenge to the phone is not its admission but rather its use – i.e., the way in which testimony relating to the phone implicated Guevara in the conspiracy by showing his familiarity with other conspirators. A police officer, Officer Cedillo, laid a foundation for the introduction of Guevara's cell phone by claiming that he found it in a bag labeled with Guevara's name in the police station. Guevara denies that he ever owned the phone and that it was taken from him. He argues, and the government now concedes, that Cedillo should not have been able to offer hearsay evidence regarding the alleged bag, or the fact that the phone may have been confiscated from Guevara. In fact, the evidence seems to have been mishandled; the government apparently cannot find any record of its having been confiscated, nor of any bag with Guevara's name on it. So this testimony should not have been permitted, as it stood.

That said, the error is harmless. Cedillo offered other, legitimate testimony circumstantially connecting the phone to Guevara, sufficient to remove any taint. Cedillo testified that he got the phone from the Fort Worth

---

[14] U.S. v. Nguyen, 504 F.3d 561, 571 (5th Cir. 2007).

[15] U.S. v. Simmons, 374 F.3d 313, 320 (5th Cir. 2004) (*quoting* U.S. v. Lowery, 135 F.3d 957, 959 (5th Cir. 1998)).

jail while Guevara was being processed there; and the record further reflects that the number for the phone was listed in co-conspirator Puente-Hernandez's phone under the name "James," Guevara's first name (he is the only known associate of Puente-Hernandez with this name); and that Guevara's alleged phone in turn listed Puente-Hernandez's number (under the entry "Joe Boss"). Even without the challenged testimony, the phone was connected to Guevara.

Furthermore, even if the phone were altogether excluded, the case was firm against Guevara. The testimony of the undercover officers, the evidence from the day of the bust, and the testimony of Garcia, all also connected Guevara to the conspiracy.

**D. Cell Phone-Related Motion for New Trial**

Guevara was sentenced on June 11, 2007. On June 19, 2007, Guevara requested a new trial pursuant to FED. R. CRIM. P. 33(a) based on new evidence that came to light after his conviction was secured. The evidence relates to the cell phone discussed above, and reveals that the bag bearing Guevara's name, from which the phone was supposedly retrieved, cannot be located, nor can any receipts or records of the phone be produced. Finally, the phone itself is apparently not "registered" to Guevara.

This court reviews a denial of a motion for a new trial for abuse of discretion. In order to receive a new trial on the basis of newly discovered evidence, the defendant must demonstrate that: "(1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) failure to detect the evidence was not due to a lack of diligence by the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is

material; and (5) the evidence introduced at a new trial would probably an acquittal."[16] As the government argues, and as the district court ruled (on July 25, 2007), there is no reason to think that (2), (4), or (5) are met in this case, and neither Guevara's original motion nor appellate brief effectively counter the government's argument, or even address it squarely. The phone evidence was not as unreliable as Guevara asserts, and it was also not, as Guevara argues, effectively the only evidence against him.

**E. Salazar-Ramirez's phone call with David Hernandez**

At trial, the district court admitted recordings of two phone calls between Puente-Hernandez and an individual who the government alleges, over his denials, was Salazar-Ramirez. The calls took place on January 19, 2006, and they feature Puente-Hernandez and another individual arranging a rendezvous for the day of the bust. Puente-Hernandez, who had immediately turned government informant upon his apprehension, made the phone call at the government's behest, in the presence of agents. After this phone call, Salazar-Ramirez showed up at the house, where he was arrested, with over $24,000 found on his person.

The court allowed a police officer Rangel to authenticate the call and to identify Salazar-Ramirez as Puente-Hernandez's interlocutor, on the theory that Rangel was present when the call was made, had had a conversation with Puente-Hernandez that very day, and was therefore capable of identifying Puente-Hernandez's voice. Salazar-Ramirez claims that these recordings should not have been admitted, or that the identification of the

---

[16] U.S. v. Bowler, 252 F.3d 741, 747 (5th Cir. 2001) (*quoting* U.S. v. Lowder, 148 F.3d 548, 551 (5th Cir. 1998)).

interlocutor as Salazar-Ramirez should not have been allowed. We review the district court's decision under a heightened abuse of discretion standard, and if there was such an abuse, the conviction will not be reversed if it was harmless.

*Authentication.* First, Salazar-Ramirez's argument as to admission of the recordings (and transcript) appears to be meritless. The tapes were authenticated by an officer who was there for the call, although it is true that the foundation testimony did not offer many details about the conversation. It is not clear whether Salazar-Ramirez even objected to this baseline admissibility at trial; although defense counsel used the word "authentication," he argued identification. Even if he properly objected to the actual authentication of the tape, there has been no meaningful challenge to their authenticity below or before this court.

*Identification.* The district court looked into the issue of identification at trial, as it was challenged by Salazar-Ramirez, and it allowed Rangel's testimony. The court did not err. Rangel was capable of testifying to Salazar-Ramirez's identity, and the jury was rightly deemed responsible for weighing the reliability of his testimony. Furthermore, even if part of Rangel's testimony was error, other testimonial evidence from Rangel could have been admitted, albeit with different means of identifying Puente-Hernandez's interlocutor. As record transcripts make clear, and as the government points out on appeal, there was powerful circumstantial evidence, certainly admissible, that the recordings were of a conversation with Salazar-Ramirez: namely, shortly after the Puente-Hernandez spoke with the individual on the

phone call requesting him to bring payment, Salazar-Ramirez showed up with over $24,000 in cash.[17]

If there was error, it was harmless. Other evidence strongly suggested Salazar-Ramirez's thorough involvement with the conspiracy, including witness testimony and his own activities on the day of the bust.

## F. Sequestration Violation and Remedy

The prosecution intended to call three co-conspirators who had pled guilty and turned government witness: Puente-Hernandez, Garcia, and Raul-Hernandez. The first one it called was Garcia, who testified for a morning, offering very damaging evidence about the drug-dealing activities of the defendants. After the morning's testimony, the court recessed for lunch.

Upon resumption of the proceedings, it came to light that, during lunch, Garcia, who was held in a room with Puente-Hernandez and Raul-Hernandez (his friends/professional colleagues and fellow government witnesses), had spoken with them while in the room, in violation of the rule of sequestration.[18] The prosecution explained that it had forgotten to inform

---

[17] On the other hand, the government's difficulty in identifying Salazar-Ramirez was that Puente-Hernandez was not allowed to testify due to his violation of the rule of sequestration; and in arguing against the court's exclusion of Puente-Hernandez, the prosecutor himself cast doubt on his ultimate method of getting this evidence in: "[Puente-Hernandez] would be the only one that could authenticate those conversations, and those conversations would lead up to as to why those individuals just happened to show up with a bunch of money in their shirts." The prosecution now argues the opposite position, advancing the argument that Puente-Hernandez was *not* the "only one" who could testify as to the phone conversation. We do not believe that this inconsistency, borne of somewhat misguided trial strategy, sufficiently calls into question the ultimate identification of this particular piece of evidence.

[18] *See* FED. R. EVID. 615.

Garcia of the rule, which he of course had no other reason to know, and had failed to insure that they were held separately during the trial.

In response to this revelation, the court interrogated Garcia, sent him back to the (same) holding area while it researched the matter and discussed it further with counsel, and finally allowed the defense to question Garcia as well. This was all out of the presence of the jury.

It emerged that the three witnesses had discussed their likely sentences, made small talk, and said a prayer. They had discussed how the defense attorneys were giving Garcia a hard time with his testimony, seeking to impeach and undermine him. And Garcia had asked the other witnesses a few substantive questions regarding the involvement of some of the defendants. It further emerged that when he was sent back after the discovery of the rule violation – this time, he was specifically instructed not to speak to his fellows – he had used a vulgar term to describe the defense lawyers, and told his fellow witnesses that they were in trouble because of their previous conversation.

After consideration of both sets of contacts in violation of the rule, the court limited Garcia's further testimony to a brief cross examination. It did not permit either Puente-Hernandez or Raul-Hernandez to testify at all. The defense did not object to this arrangement, which essentially fell in line with its requested remedy.[19]

On appeal, the defense argues that Garcia's testimony should have been stricken in its entirety and that he should have been examined in the presence of the jury regarding his violation of the rule. The defendants have

---

[19] By contrast, the unhappy prosecution referred to the remedy as "punitive."

failed to establish this position, and indeed, further testimony from Garcia regarding his violation of the rule might have led to the jury hearing hearsay concerning some of the defendants' guilt. These arguments are in any case subject to plain error review, a high standard that they do not approach.

## G. Franklin's Alleged Minor/Minimal Participation

Franklin claims he should have received a "minor" or "minimal" participant role reduction pursuant to USSG § 3B1.2,[20] since he was "only" a courier, and in fact his fellow courier (and brother-in-law) Guevara was, evidence showed, more involved than Franklin in the conspiracy. The government disagrees, noting that evidence showed Franklin helped purchase and transport large amounts of methamphetamine to West Texas. (And at the time of his arrest he was in possession of ten thousand dollars intended as drug payments.) Even if his participation were overshadowed in some ways by Guevara, his involvement exposed him to a full measure of culpability for the charged offenses.[21]

Franklin may indeed have been a less-than-average participant because he was a courier and not a main supplier, but he was not a minor or minimal player under the Guidelines.

We AFFIRM the judgment of the district court.

---

[20] Minimal participant is defined (at n. 4) as "a defendant . . . who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. . . . It is intended that the downward adjustment for a minimal participant will be used infrequently." Minor participant (n. 5) is described as a participant "who is less culpable than most other participants, but whose role could not be described as minimal."

[21] *See, e.g.*, U.S. v. Morris, 46 F.3d 410, 426 (5th Cir. 1995) (refusing reduction).

14