# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-41284

United States Court of Appeals
Fifth Circuit

**FILED**

April 13, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

ENRIQUE MENDEZ, also known as Kike, also known as Jaiba, also known as El Patron; CARLOS JAVIER FLORES, SR.; CARLOS JAVIER FLORES, JR.,

      Defendants - Appellants

---

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 5:12-CR-560-1

---

Before KING, JOLLY, and PRADO, Circuit Judges.

PER CURIAM:*

      The appellants, Enrique Mendez, Carlos Flores, Sr., and Carlos Flores, Jr., were convicted of conspiracy to distribute more than five kilograms of cocaine. In addition, Mendez was convicted of conspiracy to launder money, and three counts of aiding and abetting the transfer of currency from the United States to Mexico to promote drug trafficking. Flores Sr. was also

---

      * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-41284

convicted of aiding and abetting possession with intent to distribute five kilograms or more of cocaine.

On appeal, the defendants assert a host of arguments regarding both their convictions and their sentences. We find no reversible error, and accordingly affirm the district court's judgment.

I.

This case involves a drug trafficking conspiracy. Cocaine was transported from the border city of Laredo, Texas, to Atlanta, Georgia, for distribution, and the resulting proceeds were transported from Atlanta back to Laredo. A principal was Elbert Figueroa. Figueroa has been involved in the drug trafficking business in Mexico for many years. In 2006, Figueroa moved to Laredo from Mexico, where he was put in charge of coordinating the delivery of cocaine from Laredo to Atlanta, and the return of cash to Mexico. Flores Sr. and Flores Jr. were involved on the drug trafficking side of the operation. They carried large amounts of cocaine from the nearby town of Zapata, Texas, to Laredo for eventual shipment to Atlanta and, as noted, Figueroa moved the cocaine on to Atlanta. Mendez, who owned a trucking company, arranged transport of the proceeds from Atlanta back to Laredo. Figueroa was arrested in 2010 for his involvement in the conspiracy at issue and, as a cooperating witness in this case, helped to shatter the operation.

Eduardo Delgadillo was another important figure in this conspiracy. Delgadillo worked for Mendez, helping coordinate the transport of proceeds from Atlanta to Laredo. According to Delgadillo, he served as the point of contact between Figueroa and Mendez. Delgadillo was also arrested in 2010, and was also a cooperating witness in the prosecution of the appellants.

Finally, there are two important forms of documentary evidence in this case. First, upon arresting Figueroa, law enforcement officers seized a ledger documenting cocaine and cash shipments. The ledger includes dates, names

2

No. 14-41284

(although often trafficking pseudonyms), and the amounts of drugs/cash involved in each transfer.  Second, law enforcement obtained Title III wire taps for both Figueroa's and Delgadillo's cell phones.  According to the government, many of the intercepted calls record the appellants' discussions of drug activity.

A.

Police began monitoring Figueroa's phone calls in early 2009.  Mendez spoke with Figueroa over the phone several times in March 2009, each time complaining that he did not receive the cut he was promised.  He also complained about his trafficking pseudonym, "Kike."  Mendez preferred "La Jabia."  On March 25, 2009, Figueroa and Mendez again spoke on the phone after approximately $500,000 in drug proceeds was seized.

In May 2009, Figueroa called Delgadillo to arrange for transport of approximately $1 million in drug proceeds from Atlanta to Laredo.  Delgadillo testified that he, in turn, spoke to Mendez about moving the cash.  Mendez arranged for the transfer to occur on May 21, 2009, but became nervous when he noticed an airplane—actually a Drug Enforcement Agency ("DEA") spotter plane—circling his trucking business on the day of the transaction. Nevertheless, Mendez instructed Delgadillo to proceed with the transfer attempt. The cash was ultimately seized when local law enforcement pulled over the courier.  Later that evening, Figueroa spoke with Mendez on the phone, and demanded that Mendez obtain some official documentation of the seizure so that Figueroa could show his bosses in Mexico what happened to the money.

In July 2009, after yet another cash seizure by law enforcement, Figueroa demanded to meet with Mendez in person.  Mendez and Figueroa met at a grocery store in Laredo.  Delgadillo was also present.  The group travelled to a nearby restaurant, where they had a conversation regarding the recent uptick in cash seizures.  Law enforcement officials surveilled this meeting.

3

No. 14-41284

B.

While coordinating with Mendez regarding the shipments of cash from Atlanta to Laredo, Figueroa also had dealings with Flores Sr. and Flores Jr. regarding cocaine to be shipped from Zapata to Laredo, and eventually to Atlanta. In coordinating these shipments, Figueroa had phone conversations with a man he knew only as "Gordo." Figueroa documented these shipments in his ledger. Several government agents testified that, based on their familiarity with Flores Sr.'s voice, they believed that "Gordo" was actually Flores Sr. Testimony also showed that Flores Sr.'s actions were consistent with plans made between Figueroa and "Gordo" on the recorded phone calls.

On May 14, 2009, Figueroa and Gordo held several phone conversations during which they arranged for transfer of 100 kilograms of cocaine from Zapata to Laredo. Figueroa documented the cocaine shipment in his ledger as being attributable to Gordo. On September 13, 2009, Figueroa called Gordo again, and arranged to meet at a nearby restaurant to exchange another large load (over 100 kilograms) of cocaine. Two unidentified men arrived in a small white SUV. One of the men accompanied Figueroa to his house, where they unloaded the cocaine. The exchange was once again surveilled by law enforcement, and is documented in Figueroa's ledger as being attributable to Gordo. When following the white SUV to Figueroa's home, agents noticed a second car following the vehicle, apparently attempting to discern whether the load car was being tailed by law enforcement. One of the agents testified that he "got a good look" at the second car's driver, and that it was Flores Sr.

Two weeks later, on September 28, 2009, Gordo called Figueroa and arranged another drug exchange, this one to be held in the parking lot of a sporting goods store. Figueroa arrived at the store. Soon after, both Flores Sr. and Flores Jr. arrived in separate cars. Flores Sr. was in a white Cadillac Escalade; Flores Jr. was in a Nissan 350z. Flores Sr. was with his wife, and

4

did not have any direct contact with Figueroa.  Instead, Flores Sr. and his wife went inside the sporting goods store, while Flores Jr. met with Figueroa in the Nissan.   Flores Jr. explained to Figueroa how to access the hidden compartments in the car.  Figueroa took Flores Jr.'s Nissan to his house, where he unloaded approximately 10 kilograms of cocaine.  Again, this exchange was surveilled by law enforcement, and the transaction appeared in Figueroa's ledger as attributable to Gordo.

Flores Sr. and Flores Jr. also were involved in transporting cocaine from Zapata, Texas, to Peachtree City, Georgia via airplane.[1]  Rene Perez, an associate of Flores Jr. and Flores Sr., was in charge of smuggling this cocaine. He became a cooperating witness.  Beginning in April 2009, Perez flew at least five loads of cocaine into Peachtree City at Flores Jr.'s and Flores Sr.'s request, with the average load being approximately 200 kilograms.

On August 29, 2009, law enforcement officials in Peachtree City were contacted by the Air Marine Operations Center, which notified them that Perez's plane, currently en route from Zapata to Peachtree City, was considered a "suspicious flight."  An officer disguised as a courtesy van driver picked up Perez and the other passengers at the airport, and noticed that Perez was carrying four suitcases.  Agents later witnessed Perez give the suitcases to another individual, who in turn gave them to an individual driving a green Ford Explorer.  Officers eventually pulled over the Explorer, and found 173 kilograms of cocaine in the suitcases.  At trial, Perez testified that Flores Jr. had given him the suitcases.  Perez also testified that, after a previous successful flight, he watched Flores Sr. and Flores Jr. load the resulting cash proceeds into a hidden compartment in Flores Sr.'s car.  Figueroa apparently

---

[1] Peachtree City is approximately 20–30 minutes south of Atlanta.

No. 14-41284

had no knowledge of these cocaine trafficking flights; he did not testify about them and no entries regarding the shipments appear in his drug ledger.

In December 2011, approximately fourteen months after Figueroa's arrest, Laredo police pulled over Flores Sr. and his wife. The couple were travelling in the Nissan 350z that had been used in the cocaine exchange at the sporting goods store in September 2009. Flores Sr.'s wife was driving the car, and she consented to a search. Officers found a hidden compartment behind the passenger's seat that contained approximately $150,000. Before being told of the discovery, Flores Sr. volunteered knowledge of the money and the hidden compartment, telling the officers that the money was his and that his wife did not know anything.

## C.

The three appellants in this appeal, Mendez, Flores Jr., and Flores Sr., were indicted in June 2012. All three were charged with conspiracy to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 841. Additionally, Mendez was charged with conspiracy to launder money, and three counts of aiding and abetting the transfer of currency from the United States to Mexico to promote drug trafficking, in violation of 18 U.S.C. § 1956. Flores Sr. was also charged with aiding and abetting possession with intent to distribute five kilograms or more of cocaine, in violation of § 841. Finally, Mendez was charged with obstruction of justice for threatening a witness.

This case was tried from July 22 to July 30, 2013. The jury returned a guilty verdict as to all defendants on all drug-related counts. Mendez, however, was acquitted of the obstruction charge. Flores Jr. and Flores Sr. moved for a new trial, alleging both newly discovered evidence and the government's failure to disclose exculpatory evidence. The district court denied the motion. Mendez was sentenced to 425 months as to the conspiracy count and 260 months as to the remaining counts, to run concurrently. Flores

No. 14-41284

Sr. was sentenced to 405 months as to the conspiracy count and the aiding and abetting count, to run concurrently.  Flores Jr. was sentenced to 405 months as to the conspiracy court.

II.

As we have said earlier, the appellants assert myriad and occasionally overlapping arguments regarding both their convictions and their sentences. We address the appellants' challenges to their convictions first.  We then turn to the appellants' arguments relating to their sentences.

A.

First, all three appellants argue that the district court erred in allowing the government to project their respective photographs simultaneous with recordings of intercepted phone calls before the jury. The government introduced approximately 100 isolated segments of phone conversations between either Figueroa or Delgadillo and the appellants.  Most of the recordings were in Spanish, and had to be translated for the jury.  When playing the recorded tapes, the government used a computer program that displayed in real time the English translation of the recorded Spanish conversation.  The computer program also projected photographs of the purported speakers for each conversation.  According to the defendants, the purported speaker's photograph was highlighted as the tapes played.[2]

The photographs were part of a demonstrative aid to assist the jury in following along during the foreign language conversations.  They are thus subject to Fed. R. Evid. 611.  *See United States v. Ollison*, 555 F.3d 152, 162 (5th Cir. 2009).  "[A]llowing the use of . . . pedagogical devices intended to

---

[2] The photographs were apparently taken from the appellants' drivers licenses.  In other words, they were not mugshots and did not, on their own, suggest involvement in criminal activity.  Also, the government denies that the photographs were highlighted at any point, and the district court judge noted that, from her point of view, the photographs did not appear to be highlighted.

present the government's version of the case is within the bounds of the trial court's discretion to control the presentation of evidence. . . . Such demonstrative aids typically are permissible to assist the jury in evaluating the evidence, provided the jury is forewarned that [they] are not independent evidence." *United States v. Taylor*, 210 F.3d 311, 315 (5th Cir. 2000) (internal quotation marks and footnotes omitted). As an issue within the ambit of Fed. R. Evid. 611, the district court's decision to allow the photographic projection system is reviewed for an abuse of discretion. *See United States v. Colomb*, 419 F.3d 292, 297 (5th Cir. 2005).

After thorough review, we conclude that the district court did not abuse its discretion in allowing the projection of appellants' photographs when playing the recorded phone conversations. Before allowing the government to use the projection system at issue, the district court went to great lengths to explain to the jury that the photographs were being used merely to help the jury follow which individual, under the government's theory of the case, was alleged to be speaking during the wiretap recordings. The district court advised the jury that:

> You'll see photographs of the speakers on [the screen containing the English language translation], just to help in you being able to keep track of who it is [] supposedly talking while the tape is playing through. But in the end it's going to be up to you to determine if in fact those are the speakers on this particular call. And I'll say not only this call but all the calls. Those are your determinations.

This instruction was not an outlier. On at least three other occasions during the trial, the district court cautioned the jury that the identity of the speakers was a matter for the jury to determine based solely on admitted evidence and testimony. The district court's final jury instructions also informed the jury that "whether the transcript[s] correctly or incorrectly reflect the . . . identity

of the speakers, is entirely for you to determine based upon your own evaluation of the testimony you have heard."

The district court explicitly and repeatedly advised the jury that the photographs represented only the government's contention, and nothing more, regarding who was speaking on the wiretap recordings; with such clear instructions to the jury, we cannot say that the use of the projection system amounts to an abuse of discretion. *See United States v. Patino-Prado*, 533 F.3d 304, 313 (5th Cir. 2008) (per curiam) ("We will presume that jurors understand and follow their instructions, abandoning that presumption only when there is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect is devastating." (internal quotation marks omitted)).

The defendants attempt to transform this evidentiary issue into a due process violation by citing a string of Supreme Court cases regarding "overly suggestive" pretrial identification procedures. *See, e.g.*, *Manson v. Brathwaite*, 432 U.S. 98 (1977). These cases are, however, irrelevant to the situation here. The appellants are not alleging that law enforcement used overly suggestive techniques to coerce a witness's in-court or out-of-court identification of a defendant. Instead, the appellants make what is essentially a Fed. R. Evid. 403 argument, asserting that the photographic projections, although not actually evidence, nonetheless served to prejudice the defendants by suggesting that it was a settled fact that their voices appeared on the tapes. As explained, to the extent that the photographs could have prejudiced the appellants, the district court's detailed and repeated limiting instructions were a sufficient safeguard. Accordingly, we hold that the district court did not

No. 14-41284

abuse its discretion in allowing the projection of the defendants' photographs as part of a demonstrative aid.[3]

In a related argument, Flores Sr. asserts that the district court erred in allowing several law enforcement witnesses to identify his voice on the recorded conversations.  This argument is without merit.  These government witnesses stated that they had spoken with Flores Sr. in person, were familiar with his voice, and could identify it on the recordings.  Any further consideration of misidentity was a matter of weight for the jury, not a question of admissibility for the district court.  *See United States v. Lampton*, 158 F.3d 251, 259 (5th Cir. 1998) (stating that Fed. R. Evid. 901(b)(5) provides that "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, [can be testified to] by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker" (internal quotation marks omitted)).

B.

Mendez alone argues that the district court erred in not granting his motion for a mistrial after a government witness suggested that Mendez was also involved in another, uncharged drug offense. This court reviews a district court's denial of a motion for mistrial based on prejudicial evidence for an abuse of discretion.  *United States v. Richardson*, 781 F.3d 237, 246 (5th Cir. 2015).  Under this standard, "a new trial is required only if there is a significant possibility that the prejudicial evidence had a substantial impact upon the jury

---

[3] Although we hold that the district court did not commit reversible error in allowing the use of the projection system, we do admonish caution regarding the government's use of such methods.  Were it not for the district court's detailed instructions regarding the role of the appellants' photographs, as well as the significant amount of other evidence connecting the defendants to the conspiracy—including surveillance photos, drug ledger entries, cooperating witnesses' testimony, eye-witness testimony from law enforcement, and actual seizures of cash and drugs from the defendants' associates—we could be faced with a more difficult question.

verdict, viewed in light of the entire record." *Id* (internal quotation marks omitted).

Mendez's argument is based on testimony that occurred during the government's redirect of DEA Agent Joe Semidey.  On cross examination, Mendez's defense attorney asked several questions regarding Semidey's familiarity with Mendez's voice.  Semidey's personal knowledge of Mendez's voice having been challenged on cross examination, the government sought further foundational testimony regarding how Semidey was familiar with Mendez's voice.   This line of questioning led to the alleged prejudicial testimony:

> Q:    Okay. Did you identify Enrique Mendez'[s] voice on some of those audios?
>
> A:    Yes.
>
> Q:    How is it that you are able to identify his voice?
>
> A:    Because I have spoken to him before.
>
> Q:    How many times—well, when did you speak to him?
>
> A:    I spoke to him on September the 1st when we did the takedown, and prior to that, I had—back in 2007, I had spoken to him once relating [to] a seizure of some marijuana that was found in a ranch that belonged to him, that was adjacent to his—

Mendez contends that Semidey's comments regarding the seizure of marijuana from his property amount to impermissible testimony of prior bad acts under Fed. R. Evid. 404(b).  The district court's prompt remedial action, however, cured any possible prejudice.  The district court sustained Mendez's objection, refused to admit the testimony for any purpose, and issued the following curative instruction:

> There was a question that was asked and then an answer provided that referenced a seizure of marijuana on a property that allegedly belongs to Mr. Mendez. I'm instructing you right now,

you're not to consider that in any way, shape, or form at all. Do not consider that.

Mr. Mendez has not been charged with that act, and I will tell you that there was an individual named Mr. Gamez who apparently was leasing that property from Mr. Mendez [and] has already been convicted for that particular marijuana.

So out of your minds, you cannot consider that, that has nothing to do with this case. Does everybody understand?

Such a detailed and forceful curative instruction remedied any prejudice caused by Agent Semidey's remark. *See Richardson*, 781 F.3d at 246, 249 ("[P]rejudice may be rendered harmless by a curative instruction."). Accordingly, the district court did not err in denying Mendez's motion for a mistrial.

C.

Flores Sr. and Flores Jr. urge that the district court erred in admitting evidence regarding the cocaine trafficking flights from Laredo, Texas, to Peachtree City, Georgia. Defendants contend that the trafficking flights were "extrinsic" to the single cocaine trafficking conspiracy charged in the indictment, and that introduction of the evidence essentially violated Fed. R. Evid. 404(b). Flores Sr. further argues that evidence regarding the $150,000 seized during the December 2011 traffic stop is extrinsic to the charged conspiracy.

This court reviews evidentiary rulings for an abuse of discretion; furthermore, the harmless error doctrine applies when deciding whether to reverse for erroneous admission of extrinsic evidence. *See United States v. Liu*, 960 F.2d 449, 452 (5th Cir. 1992). In assessing violations of Rule 404(b), this court asks (1) whether the evidence is relevant to an issue other than the defendant's character; and, if it is relevant, (2) whether the evidence possesses probative value that is not substantially outweighed by the danger of unfair

prejudice (i.e., a Rule 403 assessment). *See United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc).

With certainty, we can say that the district court did not abuse its discretion in admitting the evidence regarding the cocaine trafficking flights. As this court has stated numerous times, "[t]he mere entry of a not guilty plea in a conspiracy case raises the issue of intent sufficiently to justify the admissibility of extrinsic offense evidence." *United States v. Booker*, 334 F.3d 406, 411 (5th Cir. 2003) (internal quotation marks omitted); *see also United States v. Chavez*, 119 F.3d 342, 346 (5th Cir. 1997) ("The admission of extrinsic evidence is permissible under Rule 404(b) when a defendant places his intent at issue in a drug conspiracy case by pleading not guilty.").

Furthermore, the evidence was not unfairly prejudicial. The evidence of the Atlanta trafficking flights is particularly probative, as it undercuts any assertion that the defendants lacked the intent or the means to traffic large amounts of cocaine from southern Texas to the Atlanta area. In addition, the cocaine trafficking flights were on-going during the period of the charged conspiracy; thus, the probative value of evidence relating to the flights is not weakened by a lack of temporal proximity to the charged conspiracy. *See id.*

Similarly, the district court did not abuse its discretion in admitting evidence regarding the $150,000 seized during the traffic stop of Flores Sr. and his wife. Evidence of the seizure showed that Flores Sr. was aware of the hidden compartment in his car, as Flores Sr. volunteered knowledge of the money and the hidden compartment before the arresting officers asked about it. Furthermore, given Flores's own admission that he knew of the money and the hidden compartment, as well as the significant evidence linking Flores Sr. to drug trafficking within the ambit of the charged conspiracy, a jury could conclude that the $150,000 was proceeds from the conspiracy, and thus intrinsic to the conspiracy at issue.

No. 14-41284

Finally, even if we should assume that the district court erred in admitting the extrinsic evidence, the error was harmless.  Under the harmless error doctrine, an evidentiary error is reversible only if it affects a party's substantial rights.  *United States v. McCann*, 613 F.3d 486, 498 (5th Cir. 2010).  The government has offered ample evidence that Flores Sr. and Flores Jr. were involved in the conspiracy alleged; such evidence is wholly independent of the two "extrinsic" incidents challenged here.  Accordingly, the district court's failure to exclude the extrinsic evidence at issue did not affect the appellants' substantial rights.[4]

### D.

Next, Flores Sr. and Flores Jr. argue that the district court erred in denying their post-verdict motion for a new trial.  Although both Flores Sr. and Flores Jr. joined in the motion, the "new evidence" at issue concerns only Flores Sr.  "Generally, motions for new trial are disfavored and must be reviewed with great caution."  *United States v. Piazza*, 647 F.3d 559, 565 (5th Cir. 2011).  To receive a new trial on the basis of newly discovered evidence, a defendant must show that: "(1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) failure to detect the evidence was not due to a lack of diligence by the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence introduced at a new trial would probably produce an acquittal."  *United States v. Franklin*,

---

[4] We also reject the appellants' argument that the district court erred in not instructing the jury regarding the difference between a single conspiracy and multiple conspiracies.  Flores Jr. and Flores Sr. do not contend that the government failed to offer *any* evidence connecting them to the conspiracy charged, and instead argue only that some of the evidence offered was extrinsic to the conspiracy at issue.  Thus, an instruction regarding multiple conspiracies was not required. *See United States v. Carbajal*, 290 F.3d 277, 291 n.25 (5th Cir. 2002) ("A multiple conspiracy instruction is required where the indictment charges several defendants with one (1) overall conspiracy, but the proof at trial indicates that some of the defendants were *only involved in separate conspiracies* unrelated to the overall conspiracy charged in the indictment." (emphasis added) (internal quotation marks omitted)).

561 F.3d 398, 405 (5th Cir. 2009). This court reviews a denial of a motion for new trial on the basis of newly discovered evidence for an abuse of discretion. *Id.*

First, Flores Sr. points to statements that an apparent co-conspirator, Humberto Gonzalez, made when interviewed by Flores Sr.'s investigator after trial. According to an affidavit completed by the investigator, Gonzalez, who was in prison at the time of the interview, asserted that he was one of the two men driving the white SUV that delivered cocaine to Figueroa on September 13, 2009. After listening to the intercepted recording of "Gordo" and Figueroa arranging the transaction, Gonzalez asserted that the voice of Gordo was not that of Flores Sr., and instead belonged to a man named "Manitas." Gonzalez further asserted that Manitas, not Flores Sr., hired him to deliver the cocaine. Gonzalez changed his story in a later interview, asserting that the voice on the tape was not Manitas, and that someone named "Maria" hired him to deliver the cocaine. Gonzalez also refused to sign a written affidavit, refused to testify at any new trial or hearing, and asserted that he would no longer speak about his involvement in drug trafficking operations without the presence and advice of an attorney. It follows that the district court did not abuse its discretion in denying the motion for a new trial on the basis of Gonzalez's oral statements.

Flores Sr. also offers evidence that he argues shows he was at a friend's house all day on September 13, 2009, mourning the death of one of the friend's sons, and thus could not have been involved in the drug transaction that occurred that day. Flores Sr. claims that he forgot that he was at the gathering, but was reminded when photographs of the event appeared on Facebook in October 2014, which is over five years after the supposed event. In November 2014, during a hearing on civil forfeiture and sentencing, the district court heard testimony from Flores Sr.'s friend and her other son.

Flores Sr. has not shown how his failure to offer this evidence during trial was not a product of a lack of diligence. As the district court noted, Flores Sr.'s "new evidence" does not depend on the Facebook photos; Flores Sr. could have, at any time, offered the alibi defense that he was at a friend's house. Furthermore, given that so many other friends and family members were also at the gathering, it would have taken little in the way of retracing his steps for Flores Sr. to be reminded of this event, assuming that Flores Sr. was at the gathering for the entire day as he now contends.[5] Accordingly, the district court did not abuse its discretion in denying Flores Sr.'s motion for a new trial.

Finally, Flores Sr. asserts that the government failed to disclose exculpatory evidence. This argument fails, however, for the simple reason that he has not identified any exculpatory or impeaching evidence that was supposedly withheld. At oral argument, Flores Sr. contended that the government withheld Humberto Gonzalez's involvement in the September 13, 2009 drug transaction. Flores Sr. asserts that the government had evidence suggesting that Gonzalez delivered the cocaine to Figueroa on September 13th. The government, however, has never contended that Flores Sr. actually delivered the cocaine on that date. Instead, government agents testified that Flores Sr. followed an unidentified individual—apparently Gonzalez—in a separate car, and served as a lookout for any law enforcement tails. Even if Gonzalez were driving the "load" car, this does nothing to exculpate Flores Sr., as the government never sought to prove that Flores Sr. actually delivered the cocaine on September 13th.

---

[5] The district court was skeptical of the testimony regarding Flores Sr.'s presence at the gathering, asserting that the family friend and her son had nearly identical accounts of Flores Sr.'s presence at the gathering, but could not remember any of the other events from that day or week.

No. 14-41284

Flores Sr. and Flores Jr. also seize upon one agent's testimony that, while investigating the defendants, law enforcement was also conducting a "parallel investigation" of various individuals involved in the conspiracy at issue, including the defendants themselves. The defendants now contend post-trial that they are entitled to a review of all files pertaining to the parallel investigation to see whether any information within those files could have been used to impeach the government witnesses here. As the district court noted, defendants are essentially requesting post-trial discovery, not contending that the government actually withheld exculpatory or impeaching information. Furthermore, Flores Sr. and Flores Jr. have not taken issue with the government's assertion that this "parallel investigation" was merely an investigation by another federal agency into the defendants' drug trafficking activities. Accordingly, the district court did not abuse its discretion when denying the defendants' motion for a mistrial based on the withholding of exculpatory evidence.

### III.

We now turn to the appellants' challenges to their sentences. Mendez brings several sentencing-related arguments, contending primarily that (1) the district court erred in imposing a four-level "leadership" enhancement under U.S.S.G. § 3B1.1(a); and (2) the district court erred in considering the allegations that Mendez threatened a government witness, since he was acquitted of that charge. Mendez also makes a vague, unpreserved argument regarding the procedural and substantive reasonableness of his sentence. Flores Sr. and Flores Jr. contend only that the district court erred in attributing over 450 kilograms of cocaine to them for the purposes of setting a base offense level under the guidelines.

17

No. 14-41284

A.

We first consider Mendez's argument that the district court erred in assessing a four-level "leadership" enhancement. Mendez does not dispute that his convictions placed him at a base offense level of 38 under the sentencing guidelines, which recommends a sentence ranging from 235–327 months.  The district court, however, relied upon U.S.S.G. § 3B1.1(a) to impose a four-level increase, as the court considered Mendez to be an "organizer or leader" of the drug trafficking operation at issue.  *See* U.S.S.G. § 3B1.1(a).

The question of a "leadership" role in a criminal organization is a factual determination that is reviewed for clear error.  *United States v. Valdez*, 453 F.3d 252, 263 (5th Cir. 2006).  When making these factual determinations, the district court may rely on the information in the Presentence Report ("PSR") "so long as the information has some minimum indicium of reliability." *United States v. Shipley*, 963 F.2d 56, 59 (5th Cir. 1992) (per curiam) (internal quotation marks omitted). The defendant must present rebuttal evidence to demonstrate that the information contained in the PSR is "materially untrue, inaccurate or unreliable." *United States v. Washington*, 480 F.3d 309, 320 (5th Cir. 2007) (internal quotation marks omitted). "Mere objections do not suffice as competent rebuttal evidence." *United States v. Parker*, 133 F.3d 322, 329 (5th Cir. 1998).

That Mendez was a "leader or organizer" for the purposes of the four-level enhancement is demonstrated by evidence that Mendez was the primary individual in charge of moving drug proceeds from Atlanta to Laredo.  He used his trucking company to transport large amounts of cash, and employed at least eight drivers in furtherance of this objective.  Mendez organized the transport of—under the most conservative estimate—at least $2.5 million in

drug proceeds,[6] and he was entitled to a flat 5% fee.  Mendez offers no evidence rebutting these findings; instead, he merely contends that he is more accurately described as a mere "supervisor" because the most obvious "leader" of the drug trafficking operation was Figueroa.  There can, however, be more than one individual who qualifies as a "leader or organizer." *See United States v. Cooper*, 274 F.3d 230, 247 (5th Cir. 2001).  Accordingly, Mendez's argument that the district court erred in assessing a four-level increase lacks merit.

We also reject Mendez's argument that the district court erred in considering acquitted conduct during sentencing.  Mendez contends that the district court imposed a two-level enhancement for "obstruction of justice" under U.S.S.G. § 3C1.1, and that it was improperly based on the obstruction charge for which Mendez was acquitted.  Mendez's argument is, however, contradicted by the district court's conclusion at sentencing that Mendez's total offense level was 42.  Mendez does not dispute that his base offense level was 38, and the only enhancement imposed was the four-level enhancement for his role as a "leader" in the drug trafficking operation.  Thus, the record does not support Mendez's assertion that he was assessed a two-level increase for the obstruction charge.[7]

Finally, we reject Mendez's unpreserved argument regarding the procedural and substantive reasonableness of his sentence.  Because Mendez failed to object during sentencing, our review is for plain error. *United States v. Dominguez-Alvarado*, 695 F.3d 324, 327 (5th Cir. 2012).  This court finds

---

[6] This figure is simply the amount of cash actually seized.  Relying on Figueroa's ledgers, the district court found that Mendez was responsible for aiding in the transport of over $40 million in drug proceeds.

[7] Furthermore, even to the extent that the district court did consider the allegations of witness tampering, a district court is not foreclosed from considering acquitted conduct at sentencing, so long as the conduct is proven by a preponderance of the evidence. *See United States v. Watt*, 519 U.S. 148, 157 (1997) (per curiam).

plain error when: (1) there is error; (2) the error is plain; (3) the error affects substantial rights; and (4) we may exercise our discretion to remedy the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See United States v. Cedillo–Narvaez*, 761 F.3d 397, 401–02 (5th Cir.) *cert. denied*, 135 S. Ct. 764 (2014); *United States v. Mares*, 402 F.3d 511, 520 (5th Cir. 2005). "[W]hen a sentencing judge imposes a properly calculated Guidelines sentence, '[this court] will give great deference to that sentence.'" *United States v. Alonzo*, 435 F.3d 551, 554 (5th Cir. 2006) (quoting *Mares*, 402 F.3d at 520).

Mendez has failed to show that the district court committed any error, much less "plain error." Mendez does not contend that, absent the four-level increase for a "leadership" role, the guidelines range chosen by the district court was improperly calculated. Furthermore, contrary to Mendez's assertions, the district court acknowledged its obligation to consider the sentencing factors listed in 18 U.S.C. § 3553. There is also nothing in the record indicating that the district court failed to appreciate its discretion to downwardly depart from the applicable guidelines range if warranted. Therefore, Mendez fails to satisfy the first two prongs of plain error review, and his sentence is due to be affirmed.

## B.

Flores Sr. and Flores Jr. also challenge their sentences, contending that the district court erred in attributing over 450 kilograms of cocaine to them when setting a base offense level under the guidelines. *See* U.S.S.G. § 2D1.1 (stating that an offense involving in excess of 450 kilograms of cocaine has a base offense level of 38). The district court's determination of the quantity of drugs used to establish a defendant's base offense level is a factual finding made under the preponderance of the evidence standard and reviewed for clear error. *United States v. Betancourt*, 422 F.3d 240, 247 (5th Cir. 2005).

No. 14-41284

The district court did not err in finding that Flores Sr. and Flores Jr. were responsible for over 450 kilograms of cocaine, thus in setting a base offense level of 38. Ample evidence supports the district court's finding. Figueroa testified that his cocaine connection in Zapata was a man named "Gordo," and Figueroa's drug ledger indicates that he received well over 450 kilograms from Gordo. Several agents testified that the voice of "Gordo" was that of Flores Sr., and further testimony places Flores Sr. at the scene of at least two drug exchanges arranged with "Gordo." Regarding Flores Jr., intercepted phone recordings between Figueroa and Flores Jr. indicate that Flores Sr. and Flores Jr. worked together closely in their drug trafficking business.[8] In response, Flores Sr. and Flores Jr. assert only that the district court erred in attributing drugs to them that, although arguably were within the scope of the conspiracy, were not "reasonably foreseeable" to them individually. The district court, however, made clear during sentencing that, in finding that the defendants were responsible for over 450 kilograms of cocaine, it relied only on drug quantities that were directly attributable to the defendants' actions. Thus, the appellants' argument is meritless.

IV.

Mendez, Flores Sr., and Flores Jr. have failed to show reversible error on the part of the district court. Accordingly, the judgment of the district court is

AFFIRMED.

---

[8] In addition, there is evidence that both Flores Jr. and Flores Sr. were personally involved in shipping approximately 800 kilograms of cocaine from Zapata to Atlanta via a series of private plane flights. Even assuming that this evidence is "extrinsic" to the conspiracy at issue, the district court is allowed to use "similar transactions" to gauge the scope of a defendant's trafficking operation. *See* U.S.S.G. § 2D1.1 cmt. n.5.